Execution Version

<u>Dated</u>   *15 APRIL*   2014

**DAWN SHIPPING LTD. AND**
**SUNSET SHIPPING LTD.**
as Borrowers

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Lender

and

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Swap Provider

---

**LOAN AGREEMENT**
relating to a loan facility of up to $27,700,000
in respect of
m.v. "MARINE PRINCE" and m.v. "MARINE PRINCESS"

---





**CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | POSITION OF THE BORROWERS | 16 |
| 3. | POSITION OF THE LENDER AND THE SWAP PROVIDER | 17 |
| 4. | THE LOAN | 18 |
| 5. | DRAWDOWN | 19 |
| 6. | REPAYMENT | 20 |
| 7. | PREPAYMENT AND CANCELLATION | 20 |
| 8. | INTEREST | 22 |
| 9. | FEES, COSTS AND EXPENSES | 24 |
| 10. | INCREASED COSTS | 25 |
| 11. | OTHER INDEMNITIES | 26 |
| 12. | NO SET-OFF, COUNTERCLAIM OR TAX DEDUCTION | 29 |
| 13. | SWAP TRANSACTIONS | 30 |
| 14 | EARNINGS | 31 |
| 15 | REPRESENTATIONS AND WARRANTIES | 36 |
| 16 | INFORMATION UNDERTAKINGS | 40 |
| 17. | GENERAL UNDERTAKINGS | 42 |
| 18. | VESSEL UNDERTAKINGS - INSURANCE | 45 |
| 19. | VESSEL UNDERTAKINGS - OPERATION AND MAINTENANCE | 45 |
| 20. | VALUATIONS AND ASSET PROTECTION | 45 |
| 21. | EVENTS OF DEFAULT | 47 |
| 22. | ASSIGNMENTS AND TRANSFERS | 50 |
| 23. | PAYMENT MECHANICS | 52 |
| 24. | SET-OFF | 53 |
| 25. | MISCELLANEOUS | 53 |
| 26. | NOTICES | 55 |
| 27. | APPLICABLE LAW AND JURISDICTION | 56 |
| SCHEDULE 1 - FORM OF NOTICE OF DRAWDOWN | | 58 |
| SCHEDULE 2 - CONDITIONS PRECEDENT | | 59 |
| Part 1 | Initial conditions precedent | 59 |
| Part 2 | Further conditions precedent to drawdown of a particular Tranche | 61 |
| SCHEDULE 3 - MANDATORY COSTS FORMULA | | 64 |
| EXECUTION PAGE | | 66 |

**THIS AGREEMENT** is made on *15 APRIL*    2014

**BETWEEN**

(1)     **DAWN SHIPPING LTD.** ("**Borrower A**") and **SUNSET SHIPPING LTD.** ("**Borrower B**") each a corporation incorporated under the laws of the Marshall Islands with registration number 4544 and 4543 respectively and whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (together the "**Borrowers**");

(2)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK,** a French "*société anonyme*" having a share capital of EUR 7,254,575,271, registered under number Siren 304 187 701 at the Registre du Commerce et des Sociétés of Nanterre and acting for the purposes of this Agreement through its registered office at 9, quai du Président Paul Doumer, 92920 Paris La Défense Cedex, France (the "**Lender**"); and

(3)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK,** a French "*société anonyme*" having a share capital of EUR 7,254,575,271, registered under number Siren 304 187 701 at the Registre du Commerce et des Sociétés of Nanterre and acting for the purposes of this Agreement through its registered office at 9, quai du Président Paul Doumer, 92920 Paris La Défense Cedex, France (the "**Swap Provider**").

**WHEREAS**

(A)     The Lender has agreed to make available to the Borrowers a term loan facility of up to $27,700,000 for the purpose of enabling the Borrowers to refinance their present indebtedness secured on the Vessels.

(B)     The Swap Provider may enter into swap transactions with the Borrowers from time to time for the purpose of hedging the Borrowers' exposure to interest rate fluctuations under this Agreement.

(C)     The Lender has agreed with the Swap Provider that the Swap Provider will share in the security to be granted to the Lender pursuant to this Agreement on a pari passu basis on the terms as set out in this Agreement, and to that end, pursuant to the Agency Agreement, the Lender and the Swap Provider have each appointed Crédit Agricole Corporate and Investment Bank in a separate capacity as security agent to hold each of the Lender's and the Swap Provider's share of such security.

**IT IS AGREED** as follows:

1.     **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement, including the Recital, the following expressions shall have the following meanings:

**"Accounts"** means the Drydocking Accounts, the Earnings Accounts and the Retention Accounts;

**"Accounts Security"** means the deed or other instrument creating security in respect of the Accounts (excluding the Drydocking Accounts) to be executed by the Borrowers as security for their obligations under this Agreement and the other Finance Documents in such form as the Lender may approve or require on the date of this Agreement;

**"Agency Agreement"** means the Agency Agreement dated on or around the date of this Agreement and entered into between the Lender, the Swap Provider, and Crédit Agricole Corporate and Investment Bank as security agent;

**"Applicable Margin"** means, in respect of a Tranche, 2.80% per annum;

**"Approved Flag State"** means, in relation to a Vessel, the Marshall Islands or such other jurisdiction requested by the Borrowers to which the Lender may approve;

**"Approved Shipbrokers"** means such list of shipbrokers as may from time to time be agreed in writing between the Borrowers and the Lender for the purposes of Clause 20.1.2;

**"Availability Period"** means:

(a)     in respect of Tranche A, the period commencing on the date of this Agreement and ending on the earlier of (a) 15 May 2014 (or such later date as the Lender may in its discretion agree), (b) the Drawdown Date of Tranche A and (c) the date on which the Lender's obligation to advance Tranche A is cancelled; and

(b)     in respect of Tranche B, the period commencing on the date of this Agreement and ending on the earlier of (a) 15 May 2014 (or such later date as the Lender may in its discretion agree), (b) the Drawdown Date of Tranche B and (c) the date on which the Lender's obligation to advance Tranche B is cancelled;

**"Break Costs"** means the amount (if any) by which:

(a)     the interest (excluding the Applicable Margin) which the Lender should have received for the period from the date of receipt of all or any part of a Tranche to the last day of the current Interest Period applicable to it, had the principal amount received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which the Lender would be able to obtain by placing an amount equal to the principal amount received by it on deposit with a leading bank in the London interbank market for a period starting on the Business Day of receipt or recovery and ending on the last day of such current Interest Period;

**"Business Day"** means a day (excluding Saturdays and Sundays) on which banks are open in London, Paris, Istanbul (provided that the business week in Istanbul remains Monday to Friday) and, in respect of a day on which a payment is required to be made in Dollars under a

Finance Document, also in New York City;

**"Charter"** means in relation to a Vessel, any charter of that Vessel or other contract for her employment in excess of 12 months duration made or to be made by the relevant Borrower in favour of a Charterer;

**"Charter Guarantee"** means, in relation to a Vessel, any guarantee, bond, letter of credit or other instrument provided as security for a Charterer's obligations under a Charter;

**"Charter Guarantor"** means, in relation to a Vessel, the issuer of any Charter Guarantee;

**"Charter Rights"** means, in relation to a Vessel, all rights and benefits accruing to the relevant Borrower as owner of that Vessel under or arising out of any Charter or Charter Guarantee in respect of that Vessel and which do not form part of the Earnings;

**"Charterer"** means, in relation to a Vessel, any charterer of that Vessel from the relevant Borrower or any other person from whom any Earnings are from time to time payable to the relevant Borrower;

**"CISADA"** means the United States Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010 as it applies to non-US persons;

**"Classification Society"** means, in relation to a Vessel, Nippon Kaiji Kyokai or such other classification society which is a member of the International Association of Classification Societies as may be approved in writing by the Lender;

**"Compulsory Acquisition"** means, in relation to a Vessel, requisition for title or other compulsory acquisition of that Vessel by any government or other competent authority, otherwise than by requisition for hire;

**"Confirmation"**, in relation to any continuing Designated Transaction, has the meaning given to it in the Master Agreement;

**"Corporate Guarantee"** means the irrevocable and unconditional deed of guarantee and indemnity in respect of the obligations of the Borrowers under this Agreement and the other Finance Documents to be executed by the Corporate Guarantor in such form as the Lender may approve or require on the date of this Agreement;

**"Corporate Guarantor"** means Capri Holdings Inc., a corporation incorporated under the laws of the Marshall Islands with corporation registration number 4546 whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960;

**"Default"** means any Event of Default or Potential Event of Default;

**"Default Rate"** means the annual rate of interest determined in accordance with Clause 8.3;

**"Designated Transaction"** means a transaction:

(a)      which is entered into by the Borrowers with the Swap Provider pursuant to the

Master Agreement; and

(b)     whose purpose is the hedging of all or a part of the Borrower's exposure to interest rate fluctuations under this Agreement in respect of the Loan (or any part thereof); and

(c)     which is for a period expiring no later than the final Repayment Date; and

(d)     which is evidenced by a Confirmation;

**"Dollars"** and **"$"** mean the lawful currency for the time being of the United States of America;

**"Drawdown Date"** means, in respect of a Tranche, the Business Day on which the Borrowers specify that they wish that Tranche to be advanced or (as the context requires) the date on which that Tranche is actually advanced to the Borrowers;

**"Drydocking Accounts"** means the Vessel A Drydocking Account and the Vessel B Drydocking Account (each as defined in Clause 14.1);

**"Earnings"** means, in relation to a Vessel:

(a)     all moneys whatsoever (and all claims for such moneys), present and future, which are earned or recoverable by, or become payable to or for the account of, the relevant Borrower or any other relevant person arising (whether in contract, tort or otherwise howsoever), directly or indirectly, out of the ownership, use or operation of that Vessel, including (but not limited to) all freight, hire and passage moneys, compensation payable in the event of requisition of that Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, damages for breach (or payments for variation or termination) of any charterparty or other contract for employment of that Vessel, and all moneys (other than in respect of Insurances or Requisition Compensation) arising from a Total Loss of that Vessel, together with the benefit of any guarantee, indemnity or other security which may at any time be given as security for the payment of such moneys;

(b)     all moneys which are at any time payable under the Insurances of that Vessel in respect of loss of earnings; and

(c)     if and whenever that Vessel is employed on terms whereby any moneys falling within paragraphs (a) or (b) are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to that Vessel;

**"Earnings Accounts"** means the Vessel A Earnings Account and the Vessel B Earnings Account (each as defined in Clause 14.1);

**"Environmental Affiliate"** means any agent or employee of any Obligor, or any other person having a contractual relationship with any Obligor in connection with any Relevant Ship or

her operation or the carriage of cargo and/or passengers thereon and/or the provision of goods and/or services on or from the Relevant Ship;

**"Environmental Approval"** means any permit, licence, approval, ruling, exemption or other authorisation required under applicable Environmental Laws;

**"Environmental Claim"** means:

(a) any claim by, or directive from, any applicable governmental, judicial or other regulatory authority alleging breach of, or non-compliance with, any Environmental Laws or Environmental Approvals or otherwise howsoever relating to or arising out of an Environmental Incident; or

(b) any claim by any other person howsoever relating to or arising out of an Environmental Incident,

(and, in each such case, **"claim"** shall mean a claim for damages, clean-up costs, compliance, remedial action or otherwise);

**"Environmental Incident"** means:

(a) any release, discharge, disposal or emission of Material of Environmental Concern from a Relevant Ship; or

(b) any incident in which Material of Environmental Concern is released, discharged, disposed of, or emitted by or from a ship other than a Relevant Ship and which involves collision between a Relevant Ship and such other ship, or some other incident of navigation or operation, in either case where a Relevant Ship, any of the Obligors or the managers of the Relevant Ship is or are actually or allegedly at fault or otherwise liable (in whole or in part); or

(c) any incident in which Material of Environmental Concern is released, discharged, disposed of, or emitted by or from a ship other than a Relevant Ship and where the Relevant Ship is actually or potentially liable to be arrested or attached as a result and/or where any of the Obligors or the managers of the Relevant Ship is or are actually or allegedly at fault or otherwise liable;

**"Environmental Laws"** means all national and international laws, ordinances, rules, regulations, rules of common law, conventions and agreements pertaining to pollution or protection of human health or the environment;

**"Event of Default"** means any of the events listed in Clause 21.1;

**"Excess Cashflow"** means, subject to Clause 14.4, free cash remaining out of the aggregate Earnings earned by the relevant Vessel and standing to the credit of the relevant Earnings Account following the payment of Operating Expenses, management fees and expenses after the transfers set out in Clause 14.3 have been made.

**"Facility"** means the term loan facility in the sum of up to $27,700,000 made available to the Borrowers under this Agreement;

**"Facility Period"** means the period from the date of this Agreement until the date on which:

(a)    the whole of the Outstanding Indebtedness has been repaid or paid in full;

(b)    the Lender's commitment to advance the Loan has been cancelled in full; and

(c)    the Obligors have ceased to be under any further actual or contingent liability to the Lender under or in connection with the Finance Documents;

**"Finance Documents"** means this Agreement, the Master Agreement, the Security Documents, each Notice of Drawdown and any other documents designated as such by the Borrowers and the Lender;

**"Financial Indebtedness"** means any indebtedness in respect of:

(a)    moneys borrowed;

(b)    any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)    any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)    the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease;

(e)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)    any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)    any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price excluding the Master Agreement;

(h)    any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)    the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above;

**"First Special Survey"** means, in relation to each Vessel, that Vessel's first special survey scheduled to take place during 2017;

**"First Special Survey Completion Date"** means, in relation to a Vessel's First Special Survey, the date on which the Lender confirms to the Borrowers that the Lender is satisfied

that the First Special Survey in respect of that Vessel has been completed and all costs and expenses in relation thereto have been paid;

**"Flag State"** means, in relation to a Vessel, such state or territory (being an Approved Flag State) in which the relevant Borrower's ownership title of the Vessel is from time to time registered in accordance with the provisions of the Finance Documents;

**"GAAP"** means generally accepted accounting principles in the United States of America including (without limitation) international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements;

**"General Assignment"** means, in relation to a Vessel, the deed of assignment of the Insurances, Charter Rights, Earnings and Requisition Compensation of that Vessel to be executed by the relevant Borrower as security for the Borrowers' obligations under this Agreement and the other Finance Documents in such form as the Lender may approve or require on the date of this Agreement;

**"Group"** means the Corporate Guarantor and its subsidiaries for the time being (and **"member of the Group"** shall be construed accordingly);

**"Insurances"** means, in relation to a Vessel, all policies and contracts of insurance (including all entries of that Vessel in a protection and indemnity association and a war risks association) which are from time to time taken out or entered into in respect of that Vessel or her Earnings or otherwise howsoever (as specified in greater detail in the Finance Documents) and all benefits of such policies and contracts, including all claims of whatsoever nature and return of premiums;

**"Interest Period"** means, in relation to a Tranche or any part thereof (as the case may be), each period determined in accordance with Clause 8.4 or pursuant to Clause 8.6, as the case may be;

**"Interest Rate"** means, in relation to a Tranche or any part thereof (as the case may be), the annual rate of interest which is determined by the Lender in accordance with Clause 8.2;

**"ISM Code"** means The International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the International Maritime Organisation as Resolutions A.741(18) and A.913(22) (as amended, supplemented or replaced from time to time);

**"ISPS Code"** means The International Ship and Port Facility Security Code as adopted by the International Maritime Organisation (as amended, supplemented or replaced from time to time);

**"LIBOR"** means, in relation to an Interest Period or any other relevant period:

(a)     the applicable Screen Rate; or

(b)     (if no Screen Rate is available for that period) the arithmetic mean of the rates (rounded upwards to four decimal places) quoted to the Lender by leading banks in the London interbank market,

at or about 11:00 a.m. London time on the Quotation Day for the offering of deposits in Dollars and for a period comparable to that period provided that, if any such rate is below zero, LIBOR will be deemed to be zero;

**"Loan"** means the aggregate amount of the Tranches from time to time advanced by the Lender to the Borrowers under this Agreement and, as the context may require, means the principal amount from time to time outstanding under this Agreement;

**"Major Casualty"** means, in relation to a Vessel, any casualty to that Vessel or incident involving that Vessel (other than a Total Loss) in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $500,000;

**"Management Agreement"** means, in relation to a Vessel, the agreement for the time being in force between the relevant Borrower and the Manager with respect to the management of that Vessel by the Manager and which has been approved by the Lender;

**"Manager"** means Semih Sohtorik Management & Agency Inc. or, as the case may be, such other company nominated by the Borrowers as the Lender may from time to time approve as the commercial and/or technical manager of the Vessels in accordance with the Finance Documents;

**"Manager's Undertaking"** means, in relation to a Vessel, the undertaking to be executed by the Manager with respect to its management of that Vessel and the rights of the Lender and the Swap Provider under the Finance Documents in such form as the Lender may approve or require;

**"Mandatory Cost"** means the percentage rate per annum calculated by the Lender in accordance with Schedule 3;

**"Market Disruption Event"** has the meaning given to it in Clause 8.6;

**"Master Agreement"** means the ISDA master agreement and its schedule dated the same date as this Agreement and entered into by the Borrowers with the Swap Provider and includes all Designated Transactions from time to time entered into, and all Confirmations from time to time exchanged under that agreement;

**"Master Agreement Liabilities"** means all liabilities of the Borrowers to the Swap Provider under or pursuant to the Master Agreement, whether actual or contingent, present or future;

**"Master Agreement Security"** means the deed or other instrument creating security over the Borrowers' rights under the Master Agreement to be executed by the Borrower in favour of the Lender as security for its obligations under this Agreement and the other Finance Documents in such form as the Lender may approve or require;

**"Material Adverse Change"** or **"Material Adverse Effect"** means as of the date of determination a material adverse change in or a material adverse effect on:

(a)     the financial condition or business of any Obligor;

(b)     the ability of any Obligor to perform and comply with its material obligations under any Finance Document or any Transaction Document;

(c)     the validity, legality or enforceability of any Finance Document; or

(d)     the validity, legality or enforceability of any Security Interest expressed to be created pursuant to any Security Document or the priority or ranking of that Security Interest;

**"Material of Environmental Concern"** means and includes chemicals, pollutants, contaminants, waste, toxic or hazardous substances, oil, petroleum and oil and petroleum products and any other polluting substances, the release, discharge, disposal or emission of which into the environment is regulated, prohibited or penalised by or pursuant to any Environmental Law;

**"Mortgage"** means, in relation to a Vessel, the first preferred Marshall Islands law ship mortgage over that Vessel to be executed by the relevant Borrower in favour of the Lender as security for the Borrowers' obligations under this Agreement and the other Finance Documents in such form as the Lender may approve or require on the date of this Agreement (or, as the context may require, any substitute or replacement ship mortgage securing the Outstanding Indebtedness accepted by the Lender if the Approved Flag of that Vessel is changed at any time during the Security Period relating to it);

**"Mortgaged Vessel"** mean, at any relevant time, a Vessel which is registered in the ownership of the relevant Borrower and which remains subject to a Mortgage or, as the case may be, which has become a Total Loss but in respect of which the proceeds of the Insurances have not yet been applied in accordance with Clause 7.3;

**"Notice of Drawdown"** means a notice substantially in the form set out in Schedule 1;

**"Obligor"** means a Borrower, the Corporate Guarantor, the Personal Guarantor and any other party from time to time to any of the Finance Documents, other than the Lender and the Swap Provider;

**"Operating Expenses"** means, in relation to a Vessel, the customary costs and expenses (including amounts due and payable under the Insurances) from time to time incurred by or on behalf of the relevant Borrower in connection with its ownership and operation of that Vessel, such costs and expenses always to be substantiated to the satisfaction, and at the request, of the Lender;

**"Outstanding Indebtedness"** means the aggregate of the Loan, all interest accrued on the Loan, the Master Agreement Liabilities and all other sums of money whatsoever from time to time due or owing actually or contingently to the Lender or the Swap Provider under or pursuant to the Finance Documents;

**"Permitted Security Interest"** means:

(a)    any Security Interest created by or pursuant to the Finance Documents;

(b)    liens on a Vessel for crew's wages or salvage and possessory liens on that Vessel for work carried out on that Vessel which has been approved by the Lender;

(c)    any other lien on a Vessel arising in the ordinary course of trading by statute or by operation of law in respect of obligations which are not overdue or which are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves have been provided) so long as any such proceedings or the continued existence of such lien do not involve any likelihood of the sale, forfeiture or loss of, or of any interest in, a Vessel;

**"Personal Guarantee"** means the irrevocable and unconditional deed of guarantee and indemnity in respect of the obligations of the Borrowers to be executed by the Personal Guarantor in such form as the Lender may approve or require on the date of this Agreement;

**"Personal Guarantor"** means Mr Emir Sohtorik of Cumhuriyet Caddesi, 21/1, Taksim, Istanbul, Turkey 34437 (with date of birth 6 January 1982 and with Turkish passport number U01783198);

**"Potential Event of Default"** means any event or circumstance specified in Clause 21 which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default;

**"Prohibited Person"** means any person (whether designated by name or by reason of being included in a class of persons) against whom Sanctions are directed;

**"Quotation Day"** means, in relation to any period for which an interest rate is to be determined, the day falling 2 Business Days before the first day of that period;

**"Relevant Ship"** means a Vessel and any other ship from time to time (whether before or after the date of this Agreement) owned, managed or crewed by, or chartered to, any Obligor;

**"Repayment Date"** means, in respect of a Tranche, each of the Business Days upon which a Repayment Instalment in respect of that Tranche is due and payable in accordance with Clause 6.2;

**"Repayment Instalment"** means, in respect of a Tranche, each of the instalments of that Tranche becoming due on a Repayment Date in accordance with Clause 6.1;

**"Requisition Compensation"** means, in relation to a Vessel, all moneys or other compensation payable by reason of requisition for title or other compulsory acquisition of that Vessel otherwise than by requisition for hire;

**"Retention Accounts"** means the Vessel A Retention Account and the Vessel B Retention Account (each as defined in Clause 14.1);

"**Sanctions**" means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a)     imposed by law or regulation of the United Kingdom, the Council of the European Union, the United Nations or its Security Council;

(b)     imposed by CISADA; or

(c)     otherwise imposed by any law or regulation,

by which any member of the Group is bound or to which it is subject or, as regards a regulation, compliance with which is required in the ordinary course of business of any member of the Group;

"**Screen Rate**" means, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for Dollars for the relevant period displayed on page LIBOR01 of the Reuters Screen (or any replacement Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If such page or service ceases to be available, the Lender may specify another page or service displaying the relevant rate after consultation with the Borrowers;

"**Security Documents**" means the Corporate Guarantee, the Personal Guarantee, the Mortgages, the General Assignments, the Accounts Security, the Master Agreement Security, the Shares Securities, the Manager's Undertakings and any and every other document from time to time executed as security for, or to establish a subordination or priorities arrangement in relation to, all or any of the obligations of any person to the Lender or the Swap Provider under this Agreement or any of the other Finance Documents;

"**Security Interest**" means any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, trust arrangement or security interest or other encumbrance of any kind securing any obligation of any person or having the effect of conferring security or any type of preferential arrangement (including, without limitation, title transfer and/or retention arrangements having a similar effect);

"**Security Period**" means, in relation to a Vessel, the period from the Drawdown Date of the relevant Tranche until the earlier of:

(a)     the date of completion of sale of that Vessel where she is sold in accordance with Clause 17.9;

(b)     the Total Loss Date of that Vessel where she becomes a Total Loss;

(c)     any date on which (with the approval of the Lender) the relevant Mortgage and all other Security Documents relating to that Vessel are released without being replaced by a new Mortgage and any other relevant Security Documents; and

(d)     the last day of the Facility Period;

**"Shares Security"** means, in relation to a Borrower, the deed or other instrument creating security over the whole of the issued share capital of that Borrower to be executed by the Corporate Guarantor as security for the Borrowers' obligations under this Agreement and the other Finance Documents in such form as the Lender may approve or require on the date of this Agreement;

**"Swap Unwinding Amount"** means, in relation to any part of the Loan which is prepaid under this Agreement, the aggregate amount (if any) that has to be paid by the Borrowers to the Swap Provider on the relevant prepayment date in order for the Borrower to comply with its obligation under Clause 13.4 in relation to that prepayment;

**"Total Loss"** means, in relation to a Vessel:

(a)     actual, constructive, compromised, agreed or arranged total loss of that Vessel; or

(b)     Compulsory Acquisition of that Vessel; or

(c)     capture, seizure, hijacking, theft, arrest, detention or confiscation of that Vessel by any person (not amounting to Compulsory Acquisition), unless that Vessel is released and restored to the relevant Borrower or any relevant charterer within 180 days after such capture, seizure, hijacking, theft, arrest, detention or confiscation;

**"Total Loss Date"** means, in relation to a Vessel, the date upon which a Total Loss of that Vessel is deemed for the purposes of the Finance Documents to have occurred, being:

(a)     if it consists of an actual total loss, the actual date of loss or, if that is not known, the date when that Vessel was last heard of;

(b)     if it consists of a constructive total loss, the date notice of abandonment of that Vessel is given to her insurers (provided a claim for total loss is admitted by the insurers) or, if the insurers do not forthwith admit such a claim, the date on which the total loss is subsequently admitted by the insurers to have occurred or (as the case may be) is subsequently adjudged by a competent court of law or arbitration panel to have occurred or, if earlier, the date falling 180 days after notice of abandonment of that Vessel was given to the insurers;

(c)     if it consists of a compromised, agreed or arranged total loss, the date on which a binding agreement as to such compromised, agreed or arranged total is entered into by or on behalf of the relevant Borrower with that Vessel's insurers;

(d)     if it consists of a Compulsory Acquisition of that Vessel, the date on which the requisition of title or other compulsory acquisition of that Vessel occurs; and

(e)     if it consists of capture, seizure, hijacking, theft, arrest, detention or confiscation of that Vessel by any person (not amounting to Compulsory Acquisition) and that Vessel is not released and restored to the relevant Borrower or any relevant charterer within 180 days, the date falling 180 days after the date on which the relevant capture, seizure, hijacking, theft, arrest, detention or confiscation occurred;

"**Total Loss Event**" means, in relation to a Vessel, any event which constitutes a Total Loss of that Vessel or which, with the expiry of any relevant period, would constitute such a Total Loss;

"**Total Loss Prepayment Date**" means, in relation to a Vessel which has become a Total Loss, the date which is the earlier of:

(a)     EITHER

(i)     in the case of a Total Loss consisting of an actual total loss or a Compulsory Acquisition of that Vessel, the date falling 120 days after the Total Loss Date;

OR

(ii)    if the Total Loss consists of a constructive total loss, a compromised, agreed or arranged total loss, or of capture, seizure, hijacking, theft, arrest, detention or confiscation of that Vessel by any person (not amounting to Compulsory Acquisition) and that Vessel is not released and restored to the relevant Borrower or any relevant charterer within 180 days, the date falling 30 days after the Total Loss Date; and

(b)     the date upon which the insurance proceeds or Requisition Compensation in respect of that Vessel are received by the Lender pursuant to the relevant Finance Documents,

unless that Vessel was not insured at the time of the Total Loss in accordance with the Finance Documents or an insurer has refused to meet or has disputed the claim for the Total Loss, in which case the Total Loss Prepayment Date shall be such earlier date as the Lender may stipulate by written demand to the Borrowers, such date to be no earlier than the date falling 10 Business Days after the date of the Lender's demand;

"**Tranches**" means:

(a)     the amount of up to $13,850,000 to be advanced by the Lender to the Borrowers to assist Borrower A to part refinance its present indebtedness secured on Vessel A and, as the context may require, means the principal amount from time to time drawn in respect of Vessel A and outstanding under this Agreement ("**Tranche A**");

(b)     the amount of up to $13,850,000 to be advanced by the Lender to the Borrowers to assist Borrower B to part refinance its present indebtedness secured on Vessel B and, as the context may require, means the principal amount from time to time drawn in respect of Vessel B and outstanding under this Agreement ("**Tranche B**");

"**Transaction Documents**" means each Charter, each Charter Guarantee (if any) and the Management Agreements;

**"VAT"** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere;

**"Vessels"** means:

(a)     the 35501 dwt bulk carrier "MARINE PRINCE" with IMO number 9621039 registered in the ownership of Borrower A under the laws and flag of the Marshall Islands at the port of Majuro with official number 4265 (**"Vessel A"**); and

(b)     the 35501 dwt bulk carrier "MARINE PRINCESS" with IMO number 9621041 registered in the ownership of Borrower B under the laws and flag of the Marshall Islands at the port of Majuro with official number 4266 (**"Vessel B"**).

## 1.2     Construction of certain expressions

The following expressions shall be construed in the following manner:

**"affiliate"** means, in relation to any person, a subsidiary of that person or a holding company of that person or any other subsidiary of that holding company;

**"assets"** include present and future properties, revenues and rights of every description;

**"certified copy"** means, in respect of any document, a copy of it certified as a true and complete and up to date copy of the original by a director, officer or the secretary of the relevant Obligor or by its lawyers or by another person acceptable to the Lender;

**"person"** includes an individual, firm, company, corporation, unincorporated body of persons, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

**"regulation"** includes any present or future regulation, rule, directive, requirement, request or guideline (whether or not having the force of law) of any agency, authority, central bank or government department or any self-regulatory or other national or supra-national authority;

**"relevant Borrower"** means, in relation to a Vessel, the Borrower which is (or is to become) the owner of that Vessel and **"relevant Vessel"** means, in relation to a Borrower, the Vessel which is (or is to become) owned by that Borrower;

**"subsidiary"** and **"holding company"** have the meanings given to them by Section 1159 of the Companies Act 2006 provided that a company shall be treated, for the purposes only of the membership requirement contained in sub-sections 1159(1)(b) and (c), as a member of another company even if its shares in that other company are registered in the name of (a) another person (or its nominee), whether by way of security or in connection with the taking

of security or (b) its nominee;

"**taxes**" includes all present and future income, corporation and value-added taxes and all stamp and other taxes, duties, levies, imposts, deductions, charges and withholdings whatsoever, together with interest on them and penalties with respect to them, if any, and any payments of principal, interest, charges, fees or other amounts made on or in respect of them, and references to "**tax**" and "**taxation**" shall be construed accordingly.

## 1.3   Insurance expressions

In Clause 18:

1.3.1   "**excess risks**" means the proportion of claims not recoverable in respect of general average and salvage, or under the ordinary running down clause, as a result of the value at which a vessel is assessed for the purpose of such claims exceeding her insured value;

1.3.2   "**protection and indemnity risks**" means the usual risks (including oil pollution and freight demurrage and defence cover) covered by a protection and indemnity association, being a member of the International Group of Protection and Indemnity Associations, including the proportion not otherwise recoverable in case of collision under the ordinary running down clause; and

1.3.3   "**war risks**" includes the risk of mines and all risks excluded from the Institute Time Clauses Hulls (1/11/95) by clauses 24, 25 and 26 thereof and from the International Hull Clauses (1/11/02) by clauses 29, 30 and 31 thereof.

## 1.4   General interpretation

In this Agreement:

1.4.1   unless the context otherwise requires, words in the singular include the plural and vice versa;

1.4.2   references to any document include that document as varied, supplemented or replaced from time to time;

1.4.3   references to any enactment include re-enactments, amendments and extensions of that enactment;

1.4.4   references to any person include that person's successors and permitted assigns;

1.4.5   clause headings are for convenience of reference only and are not to be taken into account in construction;

1.4.6   unless otherwise specified, references to Clauses, Recitals and Schedules are respectively to Clauses of and the Recitals and Schedules to this Agreement;

1.4.7   any words following the terms "**including**", "**include**", "**in particular**" or any similar expression shall be construed as illustrative and shall not limit the sense of the words,

description, definition, phrase or term preceding those terms;

1.4.8  references to a period of one or more "**months**" shall mean a period beginning in one calendar month and ending in the relevant calendar month on the day numerically corresponding to the day of the calendar month in which that period started, provided that (a) if that period started on the last day in a calendar month, or if there is no such numerically corresponding day, that period shall end on the last Business Day in the relevant calendar month and (b) if such numerically corresponding day is not a Business Day, that period shall end on the next following Business Day in the same calendar month, or if there is no such Business Day, that period shall end on the preceding Business Day (and "**month**" and "**monthly**" shall be construed accordingly);

1.4.9  references to an Account include all sub-accounts thereof and any substitute account from time to time opened by the relevant Borrower or Borrowers at the request of the Lender (whether with another bank or any branch, sub-branch or subsidiary of the Lender);

1.4.10  a Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

## 1.5  Conflict with other Finance Documents

In the event of any conflict between the provisions of this Agreement and the provisions of any other Finance Document, the provisions of this Agreement shall prevail.

## 1.6  Third party rights

1.6.1  Unless expressly provided to the contrary in a Finance Document, a person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or enjoy the benefit of any term of this Agreement.

1.6.2  Notwithstanding any term of any Finance Document, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement at any time.

## 2.  POSITION OF THE BORROWERS

## 2.1  Joint and several

All obligations and liabilities imposed on or assumed by the Borrowers under or pursuant to this Agreement are joint and several even if not so expressed.

## 2.2  Obligations not affected

None of the obligations and liabilities of a Borrower under the Finance Documents shall be impaired by:

2.2.1   any failure of a Finance Document to be legal, valid, binding and enforceable in relation to the other Borrower whether as a result of lack of corporate capacity, due authorisation, effective execution or otherwise;

2.2.2   any giving of time, forbearance, indulgence, waiver or discharge in relation to the other Borrower; or

2.2.3   any other matter or event whatsoever which might have the effect of impairing all or and of the liabilities any obligations of that Borrower.

## 2.3   Principal debtors

Each Borrower declares that it is and will, throughout the Facility Period, remain a principal debtor for the payment of the Outstanding Indebtedness and no Borrower shall in any circumstances be construed to be a surety for the obligations of the other Borrower under this Agreement.

## 2.4   Exclusion of rights

Each Borrower agrees that:

2.4.1   any rights which it may have at any time during the Facility Period by reason of the performance of its obligations under the Finance Documents to be indemnified by the other Borrower and/or to take the benefit of any security taken by the Lender pursuant to the Finance Documents shall be exercised in such manner and on such terms as the Lender may require. Each Borrower agrees to hold any sums received by it as a result of its having exercised any such right on trust for the Lender absolutely to be applied in payment of the Outstanding Indebtedness; and

2.4.2   it will not at any time during the Facility Period claim any set-off or counterclaim against the other Borrower in respect of any liability owed to it by that other Borrower under or in connection with the Finance Documents, nor prove in competition with the Lender in any liquidation of (or analogous proceeding in respect of) the other Borrower in respect of any payment made under the Finance Documents or in respect of any sum which includes the proceeds of realisation of any security held by the Lender for the repayment of the Outstanding Indebtedness.

## 3.   POSITION OF THE LENDER AND THE SWAP PROVIDER

## 3.1   Obligations of Lender and the Swap Provider several

The obligations of the Lender and the Swap Provider under the Finance Documents are several and, accordingly:

3.1.1   neither the Lender or the Swap Provider shall be liable for the failure of the other to perform its obligations under any Finance Document; and

3.1.2   the failure of either the Lender or the Swap Provider to perform any of its obligations under any Finance Document shall not relieve the other or any Obligor from any of

their respective obligations under those documents.

### 3.2 Rights of Lender and the Swap Provider several

The rights and interests of the Lender and the Swap Provider under the Finance Documents are several and, accordingly, notwithstanding any provision to the contrary in any Finance Document:

3.2.1   the aggregate of the amounts outstanding at any time under the Finance Documents to the Lender and the Swap Provider shall be due as a separate and independent debt; and

3.2.2   the Lender and the Swap Provider shall each have the right to sue for any amount due and payable to it from the Borrowers or any other Obligor under the Finance Documents and it shall not be necessary for the Lender or the Swap Provider (as the case may be) to be joined as an additional party in any proceedings to that end.

### 3.3 Restrictions on proceedings by the Swap Provider to enforce Security Interests

Without prejudice to the Lender and the Swap Provider's right under Clause 3.2.2 to sue for any amount due and payable to it under the Finance Documents, only the Lender may bring any proceedings against the Borrowers or any other Obligor to enforce any Security Interests arising under the Finance Documents except for proceedings to enforce any right of set-off available to the Swap Provider.

## 4. THE LOAN

### 4.1 Agreement to advance

Subject to the provisions of this Agreement, the Lender agrees to make each Tranche available to the Borrowers.

### 4.2 Availability and purpose; monitoring

Each Tranche will be available to be drawn in one amount in Dollars on the relevant Drawdown Date and is to be applied exclusively for the purpose referred to in the Recital, provided that the Lender shall not be bound to monitor or verify the application of the proceeds of any Tranche.

### 4.3 No advance after expiry of Availability Period

The Lender will have no liability whatsoever to advance a Tranche or any part of a Tranche after the date of expiry of the Availability Period for that Tranche and any part of the relevant Tranche which has not been advanced to the Borrowers at close of business on that date shall be cancelled.

5.    **DRAWDOWN**

5.1   **Notice of Drawdown**

The Borrowers may draw a Tranche subject to giving the Lender a duly completed Notice of Drawdown not later than 10:00 a.m. London time 3 Business Days before the proposed Drawdown Date, which notice shall be irrevocable and will not be regarded as having been duly completed unless (a) the proposed Drawdown Date is a Business Day within the Availability Period for that Tranche and (b) the proposed Interest Period complies with Clause 8.4.

5.2   **Conditions precedent**

Notwithstanding the giving of a Notice of Drawdown in respect of a Tranche pursuant to Clause 5.1, the Lender will not be obliged to advance that Tranche, and the Borrowers shall not be entitled to draw down that Tranche, unless the following conditions precedent are satisfied:

5.2.1   the Lender has received payment of the fees and expenses specified in Clause 9 to the extent due and payable on or before the Drawdown Date of that Tranche;

5.2.2   the Lender has received the documents and evidence described in Part 1   of Schedule 2, in form and substance satisfactory to it;

5.2.3   the Lender has received the documents and evidence relating to that Tranche described in Part 2   of Schedule 2, in form and substance satisfactory to it;

5.2.4   the Lender is satisfied both at the date of the relevant Notice of Drawdown and at the Drawdown Date of that Tranche that:

(a)    the representations and warranties contained in Clause 15 and in any other Finance Document would be true and not misleading if repeated on each of those dates with reference to the circumstances then existing;

(b)    none of the circumstances specified in Clauses 7.2, 8.6 or 10 is subsisting; and

(c)    no Default has occurred or will arise following the advance of that Tranche.

5.3   **Waiver of conditions precedent**

If the Lender in its absolute discretion advances a Tranche notwithstanding that one or more of the conditions precedent specified above remains unsatisfied on the relevant Drawdown Date, the Borrowers shall procure the satisfaction of such condition or conditions precedent within such period after such Drawdown Date as the Lender may in its absolute discretion agree in writing.

Any waiver given by the Lender under this Clause 5.3 in respect of any one Tranche shall not prejudice the Lender's right to require fulfilment in full of all such conditions precedent as are

specified in this Agreement to be applicable to the other Tranche.

## 5.4 Application of Loan proceeds

Subject to the provisions of this Agreement, the Lender will make a Tranche available to the Borrowers on the Drawdown Date of that Tranche by paying it in accordance with the relevant Notice of Drawdown given by the Borrowers. Such payment shall constitute the advance of the relevant Tranche and the Borrowers shall at that time become indebted, as principal and direct obligors, to the Lender in an amount equal to such Tranche.

## 6. REPAYMENT

### 6.1 Repayment by instalments

Subject to the provisions of this Agreement, the Borrowers shall repay each Tranche in 28 equal instalments in the amount of $225,000 together with a balloon payment, payable at the same time as the final instalment, in the amount of $7,550,000 (the "**Balloon**").  If the full amount of a Tranche is not advanced to the Borrowers, the amount of each Repayment Instalment (including the Balloon) in respect of that Tranche shall be reduced pro rata to the amount actually advanced.

### 6.2 Repayment Dates

The Repayment Instalments in respect of a Tranche shall be paid on the Business Days falling at successive 3 monthly intervals from the Drawdown Date of that Tranche .

### 6.3 Final repayment

On the final Repayment Date the Borrowers shall additionally pay to the Lender all sums which are then accrued or owing to the Lender under the Finance Documents.

## 7. PREPAYMENT AND CANCELLATION

### 7.1 Voluntary prepayment

The Borrowers shall have the right, upon giving the Lender not less than 15 Business Days' prior written notice, to prepay the Loan in whole or in part on any Business Day provided that if the Loan is to be prepaid in part the amount prepaid shall be $500,000 or an integral multiple of that amount.

### 7.2 Mandatory prepayment and cancellation upon illegality

If it becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in the Loan, the Lender shall promptly notify the Borrowers upon becoming aware of that event whereupon the Lender's obligation to advance the Tranches (to the extent still undrawn) shall be cancelled and the Borrowers shall be obliged to prepay each Tranche. Such prepayment in respect of a Tranche shall be due on the next Repayment Date for that Tranche falling after the date of the Lender's notice to the Borrowers or, if earlier, the date specified by the Lender

in its notice (being no earlier than the last day of any applicable grace period permitted by law).

### 7.3    Other mandatory prepayment events

If any of the following events occurs, the Borrowers shall prepay the Loan or relevant part thereof as follows:

7.3.1    if a Vessel is sold with the consent of the Lender under Clause 17.9, the Borrowers shall simultaneously with the completion of such sale:

    (a)    prepay the whole of the Tranche relating to that Vessel; and

    (b)    prepay such part of the other Tranche (if any) as is required to ensure compliance with the provisions of Clause 20 immediately after that prepayment has been made,

provided that, if an Event of Default has occurred which is continuing on the date such prepayment is required to be made and the net proceeds of sale of the relevant Vessel exceed the amount required to be prepaid under paragraphs (a) and (b) above, the Borrowers shall also prepay the other Tranche by an amount equal to that excess; or

7.3.2    if a Vessel becomes a Total Loss, the Borrowers shall on the Total Loss Prepayment Date relating to that Vessel:

    (a)    prepay the whole of the Tranche relating to that Vessel; and

    (b)    prepay such part of the other Tranche (if any) as is required to ensure compliance with the provisions of Clause 20 immediately after that prepayment has been made; or

provided that, if an Event of Default has occurred which is continuing on the date such prepayment is required to be made and the net proceeds received under the Insurances in respect of that Total Loss exceed the amount required to be prepaid under paragraphs (a) and (b) above, the Borrowers shall also prepay the other Tranche by an amount equal to that excess; or

7.3.3    if the Corporate Guarantor ceases to be wholly owned by and under the control of the Personal Guarantor without the prior written consent of the Lender, the Borrowers shall prepay the Loan in full immediately upon demand of the Lender.

### 7.4    Conditions of prepayment

The following shall apply to any prepayment under this Agreement:

7.4.1    each prepayment must be made together with:

    (a)    all accrued interest on the amount prepaid;

(b)     the relevant Swap Unwinding Amount payable under Clause 13.4; and

(c)     all other sums payable in respect of that amount under the provisions of this Agreement and,

in the case of prepayment of the whole of the Loan, shall be accompanied by payment of all other Outstanding Indebtedness;

7.4.2   any partial prepayment of the Loan shall be applied towards the discharge of the remaining Repayment Instalments (including the Balloon) in inverse order of maturity pro rata between the Tranches;

7.4.3   any notice of prepayment given by the Borrowers shall be effective on receipt by the Lender and, once given, may not be withdrawn or amended without the consent of the Lender and the Borrowers shall be bound to make the relevant prepayment in accordance with it;

7.4.4   no part of the Loan which is repaid or prepaid by the Borrowers may be redrawn; and

7.4.5   any prepayment made on a day other than the last day of an Interest Period applicable to the whole amount prepaid shall be made together with any Break Costs.

## 8.     INTEREST

### 8.1    Payment of interest

Subject to the provisions of this Agreement, the Borrowers shall pay interest on each Tranche or any part of it (as the case may be) at the Interest Rate applicable to it in arrears on each Repayment Date in respect of that Tranche.

### 8.2    Interest Rate

Subject to Clauses 8.3, the Interest Rate applicable to a Tranche for each Interest Period relating to that Tranche will be the annual rate of interest determined by the Lender to be the aggregate of:

8.2.1   the Applicable Margin; and

8.2.2   LIBOR (or, if a Market Disruption Event has occurred in relation to that Interest Period, the rate which expresses as a percentage rate per annum the cost to the Lender of funding that Tranche from whatever source it may reasonably select); and

8.2.3   the Mandatory Cost (if any) for that Interest Period.

### 8.3    Default Rate

If the Borrowers fail to pay any amount payable by them under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is 2% higher than the rate which would have been payable if the overdue amount had, during the period of non-

payment, constituted part of the Loan for successive Interest Periods, each of a duration selected by the Lender. Any interest accruing under this Clause 8.3 shall be immediately payable by the Borrowers on demand by the Lender. If unpaid, any such interest will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

8.4 **Borrowers' selection of Interest Periods**

Subject to Clauses 8.4.1 to 8.4.7 and the other provisions of this Agreement, the Borrowers may, by giving notice in writing to the Lender not later than 10:00 a.m. London time 3 Business Days before the first day of each Interest Period, select the duration of that Interest Period (being a period of 3 or 6 months).

The following shall apply in determining the duration of an Interest Period:

8.4.1   except as provided in this Clause 8.4, the Borrowers may select the duration of an Interest Period only in relation to the whole of the Tranche to which it relates;

8.4.2   the first Interest Period in respect of a Tranche shall commence on the Drawdown Date of that Tranche and each subsequent Interest Period in respect of a Tranche shall commence on the last day of the immediately preceding Interest Period relating to it;

8.4.3   the Borrowers shall make each selection under this Clause 8.4 (and in the case of the duration of an Interest Period being determined in accordance with Clause 8.4.5 below shall be deemed to have selected the period so determined) in such manner as to ensure that, in the event that any Repayment Date in respect of the relevant Tranche falls within the Interest Period so selected, a separate Interest Period is selected in respect of the part of the Tranche due to be repaid under Clause 6 on that Repayment Date, the expiry of which period coincides with the relevant Repayment Date (and for this purpose alone the Borrowers shall be entitled to select Interest Periods of different lengths in relation to a Tranche);

8.4.4   if the Borrowers have concluded a Designated Transaction with the Swap Provider in respect of the relevant Tranche, until such time as that Designated Transaction is terminated each Interest Period in relation to that Tranche shall be 3 months;

8.4.5   in the absence of any selection by the Borrowers of the duration of an Interest Period, or if the Lender shall certify to the Borrowers that the funds requested are not available for an Interest Period of the duration selected by the Borrowers, the duration of that Interest Period shall (subject as provided in this Clause 8.4) be 3 months or such other period as the Lender may specify;

8.4.6   if an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not); and

8.4.7   no Interest Period in respect of a Tranche shall extend beyond the final Repayment Date of that Tranche.

8.5    **Lender's notification**

The Lender shall promptly notify the Borrowers of each determination under this Agreement of (a) the duration of an Interest Period and/or (b) a rate of interest.

8.6    **Market disruption**

In this Agreement a **"Market Disruption Event"** shall occur if:

8.6.1    at or about noon on the Quotation Day for an Interest Period the Screen Rate is not available and the Lender is unable to obtain quotes from leading banks in the London interbank market enabling it to ascertain the rate of LIBOR for the relevant Interest Period; or

8.6.2    before close of business in London on the Quotation Day for an Interest Period, the Lender notifies the Borrower that the cost to the Lender of funding the Loan from whatever source it may reasonably select for that Interest Period would be in excess of LIBOR.

If a Market Disruption Event occurs and either party so requires, the Lender and the Borrowers shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest for the Loan. In the absence of such agreement, the Interest Rate shall be determined in accordance with Clause 8.2.

8.7    **No application to Master Agreement**

For the avoidance of doubt, this Clause 8 does not apply to any amount payable under the Master Agreement in respect of any continuing Designated Transaction as to which the relevant provisions of the Master Agreement shall apply.

9.    **FEES, COSTS AND EXPENSES**

9.1    **Structuring fee**

The Borrowers shall pay to the Lender on the date of this Agreement a non-refundable structuring fee of $415,000.

9.2    **Costs and expenses**

The Borrowers shall pay to the Lender on demand, and the Borrowers shall indemnify and keep the Lender indemnified against, all costs, charges, expenses, claims, liabilities, losses, duties and fees (including, but not limited to, legal fees and expenses on a full indemnity basis) and taxes thereon suffered or incurred by the Lender:

9.2.1    in the negotiation, preparation, printing, execution and registration of this Agreement and the other Finance Documents;

9.2.2    in collating, monitoring and otherwise attending to the relevant conditions precedent to drawdown of each Tranche;

9.2.3   in the enforcement or preservation or the attempted enforcement or preservation of any of the Lender's rights and powers under this Agreement and the other Finance Documents or of the security constituted by the Finance Documents;

9.2.4   in connection with any actual or proposed amendment of or supplement to this Agreement or any other Finance Document, or with any request to the Lender to grant any consent or waiver in respect of any provision of this Agreement or any other Finance Document, whether or not it is given;

9.2.5   arising out of any act or omission made by the Lender in good faith in connection with any of the matters dealt with in the Finance Documents.

The Lender agrees to obtain fee estimates for legal costs arising in respect of the matters specified in Clauses 9.2.1, 9.2.2, 9.2.4 and 9.2.5 and will notify the Borrowers in writing of such fee estimates.

## 10. INCREASED COSTS

### 10.1 Increased costs

10.1.1   Subject to Clause 10.3, the Borrowers shall, within 5 Business Days of a demand by the Lender, pay for the account of the Lender the amount of any Increased Costs incurred by the Lender or any of its affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation by any judicial authorities, agency, authority, central bank or government department or any self-regulatory or other national or supra-national authority or (ii) compliance with Basel III or (iii) compliance with any law or regulation made after the date of this Agreement.

10.1.2   In this Agreement:

**"Basel III"** means:

(a)   the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b)   the rules for global systemically important banks contained in "Global systemically important banks: assessment, methodology and additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III";

"**Increased Costs**" means:

(a)     a reduction in the rate of return from the Facility or on the Lender's (or its affiliate's) overall capital;

(b)     an additional or increased cost; or

(c)     a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by the Lender or any of its affiliates to the extent that it is attributable to the Lender having entered into its commitment to make the Facility available or funding or performing its obligations under any Finance Document.

## 10.2   Increased cost claims

If the Lender wishes to make a claim pursuant to Clause 10.1, it shall promptly notify the Borrowers of the event giving rise to the claim.

## 10.3   Exceptions

Clause 10.1 does not apply to any Increased Cost which is:

10.3.1   the subject of an additional payment under Clause 12.2 or attributable to a tax calculated by reference to the net income received or receivable by the Lender; or

10.3.2   compensated for by any payment in respect of Mandatory Costs; or

10.3.3   attributable to the wilful breach by the Lender or its affiliates of any law or regulation; or

10.3.4   attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) ("**Basel II**") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, the Lender or any of its affiliates).

## 11.   OTHER INDEMNITIES

## 11.1   VAT

11.1.1   All amounts expressed to be payable under a Finance Document by any party to the Lender or the Swap Provider which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph 11.1.2 below, if VAT is or becomes chargeable on any supply made by the Lender or the Swap Provider to any party under a Finance Document and the Lender or the Swap Provider is required to account to the relevant tax authority for the VAT, that party must pay to the Lender or the Swap Provider (in addition to and at the same time as paying any

other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that party).

11.1.2  If VAT is or becomes chargeable on any supply made by the Lender or the Swap Provider (the **"Supplier"**) to the other (the **"Recipient"**) under a Finance Document, and any party other than the Recipient (the **"Relevant Party"**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(a)  (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this paragraph (a) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(b)  (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

11.1.3  Where a Finance Document requires any party to reimburse or indemnify the Lender or the Swap Provider for any cost or expense, that party shall reimburse or indemnify (as the case may be the Lender or the Swap Provider (as the case may be) for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that the Lender or the Swap Provider (as the case may be) reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

11.1.4  Any reference in this Clause 11.1 to any party shall, at any time when such party is treated as a member of a group or unity (or fiscal unity) for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the person who is treated at that time as making the supply, or (as appropriate) receiving the supply, under the grouping rules (provided for in Article 11 of Council Directive 2006/112/EC (or as implemented by the relevant member state of the European Union) or any other similar provision in any jurisdiction which is not a member state of the European Union) so that a reference to a party shall be construed as a reference to that party or the relevant group or unity (or fiscal unity) of which that party is a member for VAT purposes at the relevant time or the relevant representative member (or head) of that group or unity (or fiscal unity) at the relevant time (as the case may be).

11.1.5   In relation to any supply made by the Lender or the Swap Provider to any party under a Finance Document, if reasonably requested by the Lender or the Swap Provider (as the case may be), that party must promptly provide the Lender or the Swap Provider with details of that party's VAT registration and such other information as is reasonably requested in connection with the Lender or the Swap Provider's VAT reporting requirements in relation to such supply.

## 11.2   Documentary taxes

The Borrowers shall promptly pay all stamp duty, registration and other similar taxes payable on or by reference to any Finance Document and shall indemnify the Lender and/or the Swap Provider on their respective written demand against any and all claims, expenses, liabilities and losses resulting from any failure or delay by the Borrowers to pay any such duty or tax.

## 11.3   Break costs and other general indemnities

The Borrowers shall pay to the Lender and/or the Swap Provider (as the case may be) on demand, and the Borrowers shall indemnify the Lender and the Swap Provider against, any Break Costs and/or other losses, expenses or liabilities whether actual or contingent (as to the amount of which the Lender and/or the Swap Provider's certificate shall be conclusive and binding upon the Borrowers, except in case of manifest error) suffered or incurred by the Lender and/or the Swap Provider in connection with or as a result of:

11.3.1   a Tranche not being drawn in full on the Drawdown Date specified in the Notice of Drawdown relating to it for any reason, other than as a result of a default by the Lender;

11.3.2   any repayment or prepayment of the whole or any part of a Tranche being made on any date other than the last day of the Interest Period applicable to it;

11.3.3   any default in payment by the Borrowers of any sum due under the Finance Documents on its due date; or

11.3.4   the occurrence or continuance of an Event of Default and/or a Potential Event of Default.

## 11.4   Currency indemnity

If any sum due from an Obligor under the Finance Documents (a **"Sum"**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **"First Currency"**) in which that Sum is payable into another currency (the **"Second Currency"**) for the purpose of making or filing a claim or proof against that Obligor or obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings, the Borrowers shall as an independent obligation, within 3 Business Days of demand, indemnify the Lender against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (a) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (b) the rate or rates of exchange available to the Lender at the time of its receipt of that Sum.

For the avoidance of doubt, this Clause 11.4 does not apply in respect of sums due from the Borrowers to the Swap Provider under the Master Agreement as to which the relevant provisions of the Master Agreement shall apply.

**11.5    Environmental indemnity**

Without prejudice to or limitation of any other rights or remedies that may at any time be available to or exercisable by the Lender, the Borrowers shall indemnify and hold harmless the Lender on demand against all costs, expenses, liabilities, losses, damages, and injury, personal or economic, sustained or incurred by it or its property (real or personal) for any reason as a result of or in connection with any release or the emission, presence, discharge of Material of Environmental Concern on, from, affecting or caused by a Vessel or any other Relevant Ship under any applicable Environmental Laws including, but not limited to, costs and expenses incurred to clean up or remove discharged oil or other Material of Environmental Concern, damages to third parties, natural resource damage, assessments or penalties, and whether sustained or incurred during or after the Facility Period.

**11.6    Survival of indemnities**

The indemnities contained in the Finance Documents shall continue in full force and effect after the full and final discharge of the Outstanding Indebtedness with respect to matters arising prior to that discharge.

**12.    NO SET-OFF, COUNTERCLAIM OR TAX DEDUCTION**

**12.1    No set-off or counterclaim**

All payments to be made by each Borrower under this Agreement and the other Finance Documents shall be made without set-off or counterclaim free and clear of, and without deduction for or on account of, any present or future taxes, unless that Borrower is compelled by law to make payment subject to any such tax.

**12.2    Gross up**

If a Borrower is compelled by law to make any tax deduction from any payment due under any of the Finance Documents, that Borrower will:

12.2.1   promptly notify the Lender upon becoming aware of that requirement;

12.2.2   pay the tax deducted to the appropriate taxation authority promptly, and in any event before any fine or penalty arises;

12.2.3   pay the Lender such additional amount as is necessary to ensure that the Lender receives a net amount equal to the full amount which it would have received had that tax deduction not been required to be made; and

12.2.4   as soon as reasonably practicable after making the relevant tax deduction, deliver to the Lender a copy of the receipt from the relevant taxation authority evidencing that the tax had been paid to that authority.

12.3    **Tax credit**

If, following any tax deduction as is referred to in Clause 12.2 from any payment by a Borrower, the Lender shall receive or be granted a credit against or remission for any taxes payable by it, the Lender shall, subject to the relevant Borrower having made any increased payment in accordance with Clause 12.2.3 and to the extent that the Lender can do so without prejudicing the retention of the amount of such credit or remission and without prejudice to the right of the Lender to obtain any other relief or allowance which may be available to it, reimburse the relevant Borrower with such amount as the Lender shall in its absolute discretion certify to be the proportion of such credit or remission as will leave it (after such reimbursement) in no worse position than it would have been in had there been no such deduction or withholding from the payment to the Lender.  Such reimbursement shall be made forthwith upon the Lender certifying that the amount of such credit or remission has been received by it.  Nothing contained in this Agreement shall oblige the Lender to rearrange its tax affairs or to disclose any information regarding its tax affairs and computations. Without prejudice to the generality of the foregoing, the Borrowers shall not by virtue of this Clause 12.3 be entitled to enquire about the Lender's tax affairs.

12.4    **Double tax treaties**

Where a Borrower is or may be obliged to withhold tax from any payment to the Lender under the Finance Documents and its obligation to withhold such tax may be eliminated or reduced under any applicable double taxation agreement or treaty, the Lender will promptly comply with all appropriate formalities required to be performed by it under such double taxation agreement or treaty (save as may depend on action being taken by a third party which has not been taken) so that it can receive payments from that Borrower under the Finance Documents without deduction of such tax or with deduction at the reduced level permitted by such double taxation agreement or treaty.

12.5    **No application to Master Agreements**

For the avoidance of doubt, this Clause 12 does not apply in respect of sums due from the Borrowers to the Swap Provider under the Master Agreement as to which the relevant provisions of the Master Agreement shall apply.

13.    **SWAP TRANSACTIONS**

13.1    **Execution of Master Agreement**

13.1.1  Concurrently with the date of this Agreement the Borrowers have entered into the Master Agreement with the Swap Provider to govern the arrangements by which the Borrowers and the Swap Providers may, subject to this Clause 13, conclude Designated Transactions.

13.1.2  Notwithstanding Clause 13.1.1, the Borrowers and the Swap Provider shall be under no obligation to conclude Designated Transactions during the Facility Period.

13.2    **Conclusion of Designated Transactions**

Subject to Clause 13.3, in the event that the Borrowers wish to conclude any Designated Transaction then:

13.2.1   the Borrowers shall advise the Swap Provider in writing;

13.2.2   subject to the Swap Provider approving the conclusion of such Designated Transaction, the Designated Transaction shall be concluded by the Borrowers with the Swap Provider; and

13.2.3   when any Designated Transaction has been concluded with the Swap Provider, the Borrowers shall sign a Confirmation with the Swap Provider the Swap Provider shall advise the Lender promptly after concluding such Designated Transaction.

13.3    **Restrictions on Designated Transactions**

13.3.1   No Designated Transaction may be entered into for any purpose other than to hedge the Borrowers' exposure to floating rate interest under this Agreement.

13.3.2   Designated Transactions may only be concluded if the relevant Interest Period (or Interest Periods) to which such Designated Transaction relates is (or are each) of 3 months' duration.

13.3.3   The initial notional principal amount of the Designated Transactions shall not exceed $27,700,000.

13.4    **Unwinding of Designated Transactions**

Unless otherwise agreed by the Swap Provider under the Master Agreement, on or prior to any prepayment or repayment of all or any part of the Loan the Borrowers shall wholly or partially reverse, offset, unwind or otherwise terminate one or more of the continuing Designated Transactions so that the notional principal amount of the continuing Designated Transactions thereafter remaining does not and will not in the future (taking into account scheduled amortisation) exceed the amount of the Loan.

13.5    **Consent to Master Agreement Security**

The Swap Provider consents to the execution of the Master Agreement Security and to the Security Interests created by it.

14.     **EARNINGS**

14.1    **Accounts**

The Borrowers undertake, on or before the first Drawdown Date, to open the following accounts with the Lender:

14.1.1   a Dollar denominated account in the name of Borrower A for the purpose of collecting the Earnings of Vessel A (the **"Vessel A Earnings Account"**), which

account Borrower A undertakes to maintain throughout the whole of the Security Period relating to Vessel A;

14.1.2  a Dollar denominated account in the name of Borrower B for the purpose of collecting the Earnings of Vessel B (the **"Vessel B Earnings Account"**), which account Borrower B undertakes to maintain throughout the whole of the Security Period relating to Vessel B;

14.1.3  a Dollar denominated account in the name of Borrower A for the purpose of retaining part of the Earnings of Vessel A on account of all budgeted expenses and costs relating to the anticipated dry docking of, or special and intermediate surveys in respect of Vessel A in accordance with this Agreement (the **"Vessel A Drydocking Account"**), which account Borrower A undertakes to maintain throughout the whole of the Security Period relating to Vessel A;

14.1.4  a Dollar denominated account in the name of Borrower B for the purpose of retaining part of the Earnings of Vessel B on account of all budgeted expenses and costs relating to the anticipated dry docking of, or special and intermediate surveys in respect of Vessel B in accordance with this Agreement (the **"Vessel B Drydocking Account"**), which account Borrower B undertakes to maintain throughout the whole of the Security Period relating to Vessel B;

14.1.5  a Dollar denominated account in the name of Borrower A for the purpose of retaining part of the Earnings of Vessel A as cash collateral security for the Borrowers' obligations under this Agreement (the **"Vessel A Retention Account"**), which account Borrower A undertakes to maintain throughout the remainder of the Security Period from the Drawdown Date of Tranche A; and

14.1.6  a Dollar denominated account in the name of Borrower B for the purpose of retaining part of the Earnings of Vessel B as cash collateral security for the Borrowers' obligations under this Agreement (the **"Vessel B Retention Account"**), which account Borrower B undertakes to maintain throughout the remainder of the Security Period from the Drawdown Date of Tranche B.

14.2  **Payment of Earnings**

Each Borrower undertakes to procure that throughout the whole of the Security Period relating to its Vessel, unless and until the Lender shall otherwise direct in accordance with Clause 14.7.1 or Clause 14.9, all Earnings due to that Borrower in respect of that Vessel shall be paid and credited to the Earnings Account relating to it.

14.3  **Application of Earnings**

So long as no Event of Default or Potential Event of Default has occurred and is continuing, any and all moneys credited to the Earnings Account relating to a Vessel will be applied as follows (which applications the Lender is irrevocably and unconditionally authorised to make and/or instruct):

14.3.1   first, in payment of any amounts due and owing under or pursuant to the Finance Documents, other than sums owing pursuant to Clauses 6 and 8;

14.3.2   secondly, by transferring from that Earnings Account to the relevant Retention Account at successive monthly intervals from the Drawdown Date of the Tranche relating to that Vessel an amount equal to $1/3^{rd}$ of the amount of that Tranche falling due for repayment under Clause 6.1 on the next succeeding Repayment Date applicable to it (but excluding the Balloon in respect of the final Repayment Instalment of a Tranche) together with an amount equal to $1/3^{rd}$ of the amount falling due by way of interest under Clause 8 on the next succeeding Repayment Date for that Tranche;

14.3.3   thirdly, by transferring from that Earnings Account to the relevant Drydocking Account at successive monthly intervals,

EITHER:

(a)   for the period commencing on the Drawdown Date of the Tranche relating to that Vessel and ending on that Vessel's First Special Survey Completion Date, an amount equal to $12,500;

OR

(b)   for the period commencing on the day immediately following the First Special Survey Completion Date for such Vessel, an amount equal to $10,000;

provided that if the credit balance in the relevant Earnings Account is insufficient for any such transfer to be made, the Borrowers will, on demand, remit to the Lender the sum necessary to rectify the insufficiency. If for any reason the Earnings of a Vessel are not being received on a monthly basis, the Lender is authorised by the relevant Borrower, as and when such Earnings are received, to retain as much of those Earnings as the Lender considers necessary to ensure the discharge of amounts becoming due from the Borrowers pursuant to Clauses 6, 8, 14.3.2 and 14.3.3; and

14.3.4   lastly, subject always to the requirements of Clauses 14.4 and 14.5 and to the Lender's rights under Clause 14.9, the balance (if any) in an Earnings Account will be freely available to the relevant Borrower for payment and/or reimbursement of the Operating Expenses, management fees and expenses relating to its Vessel provided always that the payment and/or reimbursement of such Operating Expenses, management fees and expenses shall be made only through the Lender and shall be conditional upon the relevant Borrower providing the Lender (if so requested by the Lender) with the relevant invoices, statements, vouchers, receipts and such other information or evidence as the Lender may reasonably require.

14.4    **Minimum balance**

The Borrowers undertake to maintain on the Earnings Account relating to a Vessel, at all times from the Drawdown of the Tranche relating to that Vessel until the date on which that Tranche is repaid or prepaid in full, a minimum balance of $250,000.

14.5    **Cash sweep**

14.5.1   Not later than 7 days before each Repayment Date, the Borrowers shall deliver to the Lender a written statement in a form previously approved by the Lender showing the calculation of the Excess Cashflow for the relevant Vessel for the preceding three month period.

14.5.2   Subject to Clause 14.4 and 14.5.3, all Excess Cashflow in respect of each Vessel generated during each three-month period and standing to the credit of the relevant Earnings Account shall be applied on the Repayment Date falling at the end of each three-month period specified in Clause 14.5.1 as follows:

(a)    50% of such balance towards the prepayment of the Loan in accordance with Clause 7.1, save that the requirement that the amount prepaid shall be $500,000 or an integral multiple of that amount, shall not apply; and

(b)    provided that no Event of Default or Potential Event of Default has occurred and is continuing, 50% of such balance to the relevant Borrower or to its order.

14.5.3   Together with any other voluntary prepayments of the Loan made by the Borrowers in accordance with Clause 7.1, the maximum aggregate amount of Excess Cashflow that shall be utilised towards prepayment of the Loan in accordance with Clause 14.5.2(a) is $2,500,000, and following receipt of such prepayment by the Lender this Clause 14.5 shall cease to apply.

14.6    **Application of amounts standing to the credit of the Drydocking Accounts**

14.6.1   So long as no Event of Default or Potential Event of Default has occurred and is continuing, any and all moneys credited to the Drydocking Account relating to a Vessel will be applied as follows (which application the Lender is irrevocably and unconditionally authorised to make and/or instruct):

EITHER

(a)    during the period commencing on the Drawdown Date in respect of the relevant Tranche and ending on that Vessel's First Special Survey Completion Date:

(i)    firstly, in or toward payment of all properly incurred and documented costs and expenses relating to that Vessel's First Special Survey then due and payable; and

(ii)    secondly, subject always to the Lender's rights under Clause 14.9, the balance (if any) in that Drydocking Account will be freely available to the relevant Borrower or to its order,

OR

(b)    during the period commencing on the day following the First Special Survey Completion Date and ending on the last day of the Facility Period,

(i)    firstly, in or towards payment of all properly incurred and documented costs and expenses relating to any special and intermediate survey in respect of that Vessel that may occur; and

(ii)    secondly, subject always to the Lender's rights under Clause 14.9, the balance (if any) in that Drydocking Account will be freely available to the relevant Borrower or to its order,

provided that if the credit balance in the relevant Drydocking Account is insufficient for any such payment to be made, the Borrowers will, on demand, remit to the Lender the sum necessary to rectify the insufficiency.

## 14.7 Borrowers' obligations with respect to Accounts

The Borrowers will, at the request of the Lender:

14.7.1    transfer or procure the transfer of any funds credited to any of the Accounts, and pay or procure the payment of any Earnings, to such other account or accounts in substitution therefor with the Lender or any other bank or with any branch, sub-branch or subsidiary of the Lender or any other bank as the Lender may from time to time specify; and

14.7.2    immediately upon demand do all such acts and things and execute such documents as the Lender may require in order to create security over the Accounts more effectively to secure the payment of the Outstanding Indebtedness.

## 14.8 Authorisation of applications

The Lender is irrevocably authorised by the Borrowers to apply on each Repayment Date in respect of a Tranche all amounts on the relevant Retention Account in satisfaction of the amounts due from the Borrowers to the Lender on that date in respect of the repayment of that Tranche and the payment of interest on that Tranche or part of it.

## 14.9 Appropriation after default

On or at any time after the happening of an Event of Default or a Potential Event of Default which is continuing:

14.9.1    no Borrower shall be entitled to make any further withdrawal from any of the Accounts without the prior consent of the Lender; and

14.9.2   the Lender shall immediately become entitled to direct that the Earnings of the Vessels be paid to such place and account as the Lender may think fit and (without prejudice to the Lender's rights under Clause 21.2) at any time, and without notice to the Borrowers, to appropriate all or any of the moneys standing to the credit of the Accounts and any Earnings which may then be received by the Lender and apply them in or towards the discharge of the Outstanding Indebtedness in accordance with Clause 23.2.

14.10   **Continuing obligations of Borrowers**

Nothing in this Clause 14 or in the Accounts Security, whether express or implied, shall relieve the Borrowers of their absolute and unconditional obligation to repay the Loan, to pay interest thereon and to pay all other sums from time to time due, owing or payable under this Agreement and under any of the other Finance Documents.

15.   **REPRESENTATIONS AND WARRANTIES**

15.1   **Date of representations and warranties**

The Borrowers represent and warrant that the following matters are true at the date of this Agreement.

15.2   **Existence, powers, compliance and solvency**

Each Borrower:

15.2.1   is a corporation duly incorporated with limited liability, validly existing and in good standing under the laws of its place of incorporation;

15.2.2   has full power to own its property and assets and to carry on its business as it is now being conducted;

15.2.3   has complied with all statutory and other requirements relative to its business;

15.2.4   is solvent and not in liquidation or administration or subject to any other insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of it or all or any part of its assets.

15.3   **Capacity and authorisation**

The entry into and performance by each Borrower of this Agreement and the other Finance Documents and the Transaction Documents to which it is (or is to become) a party are within the corporate powers of that Borrower and have been duly authorised by all necessary corporate and shareholder actions and approvals and no limitation on its powers will be exceeded as a result of the borrowings made or other liabilities incurred under this Agreement or the other Finance Documents. In entering into this Agreement and the other relevant Finance Documents and Transaction Documents each Borrower is acting on its own account and not as agent or nominee of any person.

## 15.4 No contravention of laws or contractual restrictions

The entry into and performance by each Borrower of this Agreement and the other Finance Documents and the Transaction Documents to which it is (or is to become) a party do not and will not:

15.4.1 contravene in any respect the constitutional documents of that Borrower or any law, regulation or contractual restriction binding on that Borrower or any of its assets; or

15.4.2 result in the creation or imposition of any Security Interest (other than a Permitted Security Interest) on any of its assets in favour of any party.

## 15.5 Licences and approvals in force

All licences, authorisations, approvals and consents necessary for the entry into, performance, validity, enforceability or admissibility in evidence of this Agreement, the other Finance Documents and the Transaction Documents have been obtained and are in full force and effect and there has been no breach of any condition or restriction imposed in this respect.

## 15.6 Validity and enforceability

When duly executed and delivered, and where applicable registered, each of the Finance Documents will:

15.6.1 constitute the legal, valid and binding obligations of each Obligor which is a party thereto enforceable against such Obligor in accordance with its terms; and

15.6.2 (to the extent that by its terms it purports to do so) create a legal, valid and binding first priority Security Interest in accordance with its terms over all the assets to which by its terms it relates,

except insofar as enforcement may be limited by any applicable laws relating to bankruptcy, insolvency, administration and similar laws affecting creditors' rights generally and by principles of equity.

## 15.7 No third party Security Interests; title

At the time of execution of each Security Document, save for any existing security granted in favour of the current financier of the Borrowers, no third party will have any Security Interest (other than a Permitted Security Interest) on any asset over which a Security Interest is to be created pursuant to that Security Document and the Obligor entering into that Security Document will be the sole and absolute legal and beneficial owner of that asset.

## 15.8 Status of Transaction Documents

The copies of the Transaction Documents delivered to the Lender before the date of this Agreement are true and complete copies. The Transaction Documents constitute legal, valid, binding and enforceable obligations of the parties to them in accordance with their respective terms except insofar as enforcement may be limited by any applicable laws relating to

bankruptcy, insolvency, administration and similar laws affecting creditors' rights generally and by principles of equity. No amendments or additions to the Transaction Documents have been agreed nor has any party to any Transaction Document waived any of its respective rights under that Transaction Document.

15.9     **No litigation current or pending**

No litigation, arbitration, tax claim or administrative proceeding is current or pending or (to the knowledge of either Borrower) threatened, which, if adversely determined, would have a Material Adverse Effect.

15.10    **No defaults**

15.10.1 No Event of Default or Potential Event of Default is continuing or might reasonably be expected to result from the advance of the Loan.

15.10.2 No Borrower nor the Corporate Guarantor is in default under any other agreement where such default would or might have a Material Adverse Effect.

15.11    **No immunity**

No Obligor is entitled to claim any immunity in relation to itself or its assets under any law or in any jurisdiction in connection with any legal proceedings, set-off or counterclaim relating to this Agreement or the other Finance Documents or in connection with the enforcement of any judgment or order arising from such proceedings.

15.12    **Truth of financial and other information**

All factual information furnished in writing to the Lender by or on behalf of the Borrowers or any other Obligor in connection with the negotiation and preparation of this Agreement and the other Finance Documents was (when given) true and correct in all material respects and (to the knowledge of either Borrower) there are no other facts or considerations the omission of which would render any such information materially misleading.

15.13    **No liability to deduction or withholding**

All payments to be made by the Borrowers under this Agreement and the other Finance Documents may be made free and clear of and without deduction or withholding for or on account of any taxes.

15.14    **Tax compliance**

Each Borrower has complied in all material respects with all relevant tax laws and regulations applicable to it and its business.

15.15    **Ownership of shares**

All of the issued and outstanding shares of each Borrower are wholly owned legally, beneficially and of record by the Corporate Guarantor, all of whose issued and outstanding shares are wholly owned beneficially by the Personal Guarantor.

### 15.16   Pari passu obligations

The payment obligations of each Borrower under the Finance Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

### 15.17   No commissions or rebates

There are no commissions, rebates, premiums or other payments by or to or for the account of the Borrowers or the Corporate Guarantor, their respective shareholders or directors in connection with the transactions contemplated by this Agreement, other than as disclosed to the Lender in writing.

### 15.18   Environmental matters

Except as may have been disclosed by the Borrowers in writing to, and acknowledged in writing by, the Lender:

15.18.1 the Borrowers and the other Obligors and, to the best of each Borrower's knowledge and belief (having made due enquiry), their respective Environmental Affiliates have complied with the provisions of all Environmental Laws;

15.18.2 the Borrowers and the other Obligors and, to the best of each Borrower's knowledge and belief (having made due enquiry), their respective Environmental Affiliates have obtained all Environmental Approvals and are in compliance with all Environmental Approvals;

15.18.3 none of the Borrowers nor any other Obligor nor, to the best of each Borrower's knowledge and belief (having made due enquiry), any of their respective Environmental Affiliates has received notice of any Environmental Claim that alleges that any Borrower or other Obligor or any Environmental Affiliate is not in compliance with any Environmental Law or any Environmental Approval;

15.18.4 there is no Environmental Claim pending or, to the best of each Borrower's knowledge and belief (having made due enquiry), threatened against any Borrower or other Obligor or any Relevant Ship or, to the best of each Borrower's knowledge and belief (having made due enquiry), any of their respective Environmental Affiliates; and

15.18.5 no Environmental Incident which could or might give rise to any Environmental Claim has occurred.

### 15.19   No money laundering

In relation to the utilisation by each Borrower of the Facility, the performance and discharge of its obligations and liabilities under the Finance Documents to which it is a party, and the transactions and other arrangements effected or contemplated by the Finance Documents to which it is a party, each Borrower confirms that it is acting for its own account and that the foregoing will not involve or lead to contravention of any law, official requirement or other

regulatory measure or procedure implemented to combat "money laundering" (as defined in Article 1 of the Directive 2005/60/EC of the European Parliament and of the Council of the European Union of 26 October 2005).

15.20 **Sanctions**

15.20.1 No Obligor is a Prohibited Person or is owned and/or controlled (directly or indirectly) by a Prohibited Person.

15.20.2 No proceeds of the Facility shall be made available to or for the benefit of a Prohibited Person nor shall they otherwise be applied (directly or indirectly) in a manner or for a purpose prohibited by Sanctions.

15.21 **Centre of main interests and establishments**

For the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the **"Regulation"**), the centre of main interest (as that term is used in Article 3(1) of the Regulation):

15.21.1 for Borrower A is situated in the Marshall Islands; and

15.21.2 for Borrower B is situated in the Marshall Islands,

and no Borrower has any "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

15.22 **Continuing nature of representations and warranties**

The Borrowers agree that the representations set out in this Clause 15 (other than the ones in Clauses 15.5, 15.9, 15.10.1 and 15.12) shall survive the execution of this Agreement and shall be deemed to be repeated on each Drawdown Date and each Repayment Date with reference to the facts and circumstances then subsisting, as if made on that date.

16. **INFORMATION UNDERTAKINGS**

16.1 **Duration of undertakings**

The undertakings in this Clause 16 shall remain in force from the date of this Agreement to the end of the Facility Period.

16.2 **Provision of financial and other information**

The Borrowers will provide to the Lender:

16.2.1 within 180 days of the end of each financial year, certified copies of the consolidated financial statements of the Group and the profit and loss accounts and balance sheets of each Borrower for that financial year, prepared in accordance with GAAP and audited by auditors previously approved in writing by the Lender;

16.2.2 within 90 days of the end of each financial half-year, certified copies of the unaudited consolidated financial statements of the Group and the unaudited profit and loss accounts and balance sheets of each Borrower for that period, prepared in accordance with GAAP;

16.2.3 together with the consolidated financial statements referred to in Clause 16.2.1 and 16.2.2, details of all off-balance sheet or charter commitments of the Vessels and the valuations required pursuant to Clause 20.1;

16.2.4 on or before the Drawdown Date relating to the relevant Vessel and then on each anniversary of that Drawdown Date, a certified copy of the annual budget prepared by the Manager setting out that Vessel's projected Operating Expenses for the next 12 month period;

16.2.5 promptly, such further information in the possession or control of the Borrowers regarding the financial condition and operations of the Group as the Lender may reasonably request.

## 16.3 Notification of default

The Borrowers shall:

16.3.1 notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon their becoming aware of the occurrence thereof, stating whether in their opinion such Default is an Event of Default or a Potential Event of Default; and

16.3.2 promptly upon a request by the Lender, supply to the Lender a certificate signed on behalf of each Borrower by two of its directors or senior officers certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

## 16.4 Notification of material litigation and other proceedings

The Borrowers shall inform the Lender promptly of any litigation, arbitration, tax claim or administrative proceeding instituted or (to their knowledge) threatened and of any other occurrence of which they become aware which might have a Material Adverse Effect.

## 16.5 Provision of other information

The Borrowers shall promptly provide the Lender with such other information concerning themselves, their affairs and the Vessels as the Lender may from time to time require, including (but without limitation) full information regarding the employment, condition, geographical position, crewing and engagements of the Vessels and particulars of all contracts concerning the Vessels.

16.6 **"Know your customer" checks**

The Borrowers shall promptly provide the Lender with any information requested by it in order for it to comply with any anti-money laundering or "know your customer" legislation, regulation or procedures applicable to it from time to time.

17. **GENERAL UNDERTAKINGS**

17.1 **Duration of undertakings**

The undertakings in this Clause 17 shall remain in force from the date of this Agreement to the end of the Facility Period.

17.2 **Maintenance of status and domicile**

Each Borrower:

17.2.1 shall maintain its corporate existence as a limited liability company duly organised, validly existing and in good standing under the laws of the Marshall Islands;

17.2.2 shall not, without the prior consent of the Lender, change its place of incorporation or domicile or alter its legal status as a limited liability company nor establish a different "centre of main interest" from that referred to in Clause 15.21.

17.3 **Authorisations**

Each Borrower shall obtain and maintain in force, and promptly furnish certified copies to the Lender of, all licences, authorisations, approvals and consents, and do all other acts and things, which may from time to time be necessary or desirable for the continued due performance of its obligations under the Finance Documents and Transaction Documents to which it is a party or which may be required for the validity, enforceability or admissibility in evidence of such Finance Documents and Transaction Documents.

17.4 **Pari passu obligations**

Each Borrower shall ensure that at all times any unsecured and unsubordinated claims of the Lender against it under the Finance Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

17.5 **Compliance with laws**

Each Borrower shall comply in all respects with all laws and regulations (including, without limitation, all relevant Environmental Laws) to which it may be subject.

17.6 **Anti-corruption law**

17.6.1 No Borrower shall (and each Borrower shall procure that no other member of the Group or other Obligor will) directly or indirectly use the proceeds of the Facility for any purpose which would breach the Bribery Act 2010, the United States Foreign

Corrupt Practices Act of 1977 or other similar legislation in any other jurisdictions to which it might be subject.

17.6.2  Each Borrower shall (and each Borrower shall procure that each other member of the Group and each other Obligor will):

(a)  conduct its business in compliance with applicable anti-corruption laws; and

(b)  maintain policies and procedures designed to promote and achieve compliance with such laws.

## 17.7   Payment of taxes

Each Borrower shall pay all taxes, assessments and other governmental charges as they fall due, except to the extent that it is contesting them in good faith by appropriate proceedings and has set aside adequate reserves for their payment if those proceedings fail.

## 17.8   Books of account

Each Borrower shall keep proper books of account in respect of its business in accordance with GAAP consistently applied and, whenever so requested by the Lender, make them available for inspection by or on behalf of the Lender.

## 17.9   Restriction on disposals

Except as contemplated by this Agreement, no Borrower shall, without the prior consent of the Lender (which shall not be unreasonably withheld where the consideration for such sale is the Vessel's market value at the relevant time), sell or agree to sell its Vessel (unless the Tranche relating to that Vessel and any other relevant part of the Loan is prepaid in accordance with Clause 7.3.1 upon the completion of that sale) or convey, assign, transfer, sell, lease or otherwise dispose of or deal with any of its other real or personal property, assets or rights, whether present or future.

## 17.10   Negative pledge

No Borrower shall, without the prior consent of the Lender, create or permit to exist any Security Interest (other than a Permitted Security Interest) over any part of its undertaking, property, assets or rights, whether present or future (provided that where any such Security Interest arises in the ordinary course of business, the relevant Borrower shall promptly discharge it).

## 17.11   Restrictions on loans, guarantees and investments

No Borrower shall, without the prior consent of the Lender:

17.11.1 incur any Financial Indebtedness (except under the Finance Documents) nor incur any obligations as lessee under leases;

17.11.2 except as contemplated by this Agreement, assume, guarantee or endorse, or otherwise become or remain liable for, any obligation of any other person;

17.11.3 make any loans or advances to, or any investments in, any person (including, without limitation, any officer, director, stockholder, employee or customer of that Borrower);

17.11.4 incur any capital expenditure or make any investments in any property or other assets other than in the ordinary course of business of owning, operating its Vessel;

17.11.5 form or acquire any subsidiary.

## 17.12 No mergers or demergers

No Borrower shall, without the prior consent of the Lender, consolidate, amalgamate or merge with any other entity or demerge or enter into any form of reconstruction or reorganisation or do anything analogous thereto.

## 17.13 No change to financial year or auditors

No Borrower shall, without the prior consent of the Lender, alter or extend its financial year for the purposes of the preparation of its accounts, or change its auditors.

## 17.14 Restrictions on share issues and transfers

No Borrower shall, without the prior consent of the Lender, issue any further shares or register any transfer of any of its shares, whether by subscription or transfer, or allow any share certificate of such Borrower to be exchanged for another certificate issued to bearer for a like number of shares.

## 17.15 Shareholder loans

No Borrower shall, without the prior consent of the Lender (which consent shall not be unreasonably withheld), make any payment of principal or interest to any of its shareholders or their affiliates in respect of any loans or loan capital made available to it by them.

## 17.16 Change of business

No Borrower shall, without the prior consent of the Lender, conduct any business other than the ownership and operation of its relevant Vessel.

## 17.17 Transactions with affiliates

No Borrower shall, without the prior consent of the Lender, undertake any transaction with any person, company or other entity which is an affiliate of that Borrower unless such transaction is conducted at arm's length on normal commercial terms.

## 17.18 Transaction Documents

Each Borrower:

17.18.1 shall, without affecting its obligations under the applicable provisions of the Finance Documents, perform and observe its obligations under the Transaction Documents to which it is a party and use its best endeavours to procure that each of the other parties

to those Transaction Documents performs and observes its obligations under them; and

17.18.2 shall not, without the prior consent of the Lender, waive or fail to enforce any provision of, or agree to any amendment or supplement to, the Transaction Documents to which it is a party.

## 18.    VESSEL UNDERTAKINGS - INSURANCE

Each Borrower undertakes to the Lender , in respect of its Vessel owned by it, to comply with the undertakings contained in  clause 5 of the relevant Mortgage at all times from the Drawdown Date of the relevant Tranche until the end of the Security Period relating to it.

## 19.    VESSEL UNDERTAKINGS - OPERATION AND MAINTENANCE

Each Borrower undertakes to the Lender, in respect of its Vessel owned by it, to comply with the undertakings contained in this Clause 6 of the relevant Mortgage at all times from the Drawdown Date of the relevant Tranche until the end of the Security Period relating to it, provided that at any time after a Total Loss Event has occurred and is continuing in respect of a Vessel the relevant Borrower shall not be obliged to perform any of its undertakings in respect of that Vessel under Clause 6 of the relevant Mortgage to the extent that it would be impossible or impractical for it to do so.

## 20.    VALUATIONS AND ASSET PROTECTION

### 20.1    Valuations

Subject to Clause 20.4, the Lender may from time to time and in any case, on or around 30 June and 31 December in each calendar year during the Facility Period, arrange for a valuation of each Mortgaged Vessel to be carried out in order to determine her market value. Such valuations shall be addressed to the Lender and shall be prepared:

20.1.1   with or without a physical inspection of the relevant Vessel (at the discretion of the Lender) in Dollars on the basis of a sale for prompt delivery, charter-free, at arm's length between a willing seller and a willing buyer;

20.1.2   by any Approved Shipbroker as the Lender may from time to time select;

and the market value of a Vessel shall be deemed to be that as set out in such valuation, except that:

(a)      if a Vessel is subject to a Mortgage under which the amount recoverable is restricted to a registered maximum mortgage amount, the market value of that Vessel shall be restricted to that mortgage amount if the valuation otherwise determined under this Clause 20.1 would be higher; and

(b)      if a Vessel becomes a Total Loss but the proceeds of the Insurances in respect of that Total Loss have not yet been applied in accordance with Clause 7.3, that Vessel shall be deemed to have a market value equal to its insured value

or, if lower, such amount as the Lender determines is reasonably expected to be received from that Vessel's insurers in respect of such Total Loss.

The Borrowers shall provide such assistance as the Lender shall require in connection with all valuations prepared under this Clause 20 and each such valuation shall be conclusive and binding on the Borrowers save in the case of manifest error.

20.2 **Consequences of security shortfall**

If the aggregate of (a) the market values of the Mortgaged Vessels determined pursuant to Clause 20.1 and (b) the market value of any additional security previously provided under this Clause 20 is

EITHER

(a)     (at any time during a period when both Mortgaged Vessels are employed under a Charter), less than 125% of the Outstanding Indebtedness,

OR

(b)     (at any other time), less than 130% of the Outstanding Indebtedness,

(each of (a) and (b) above, a "**security shortfall**"), the Borrowers shall, within 3 Business Days of a demand by the Lender to that effect, either (at the Borrowers' option):

20.2.2 provide additional security over such assets and in such form as is acceptable to the Lender where such assets have an aggregate market value at least equal to the security shortfall; or

20.2.3 prepay such part of the Loan as will eliminate the security shortfall in accordance with the relevant provisions of Clause 7.4; or

20.2.4 make good the security shortfall by combining the provision of additional security under Clause 20.2.2 with a partial prepayment of the Loan under Clause 20.2.3.

20.3 **Valuation of additional security**

The market value of any additional security provided or to be provided under this Clause 20 shall be determined at the cost of the Borrowers on such basis and by such independent valuers as the Borrowers and the Lender may agree (or, in the absence of such agreement, on such basis and by such independent valuers as shall be selected by the Lender).

20.4 **Timing and cost of valuations**

The Borrowers shall pay the costs for the Mortgaged Vessels and any additional security to be valued under this Clause 20 on or around 30 June and 31 December in each calendar year during the Facility Period, provided that following the occurrence of an Event of Default which is continuing all valuations shall be at the cost of the Borrowers.

21.   **EVENTS OF DEFAULT**

21.1   **Defaults**

Each of the following events or circumstances is an Event of Default:

21.1.1   **Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to the Finance Documents (excluding the Master Agreement) at the place and in the currency in which it is expressed to be payable or, in respect of moneys payable on demand, (unless otherwise specifically provided) within 5 Business Days from the date of demand.

21.1.2   **Security shortfall**

A security shortfall occurs under Clause 20 and is not eliminated or otherwise made good within the period specified in Clause 20.2.

21.1.3   **Breach of insurance obligations**

Any Vessel is not, or ceases to be, insured in the relevant amount and on the relevant terms specified in Clause 18 or either Borrower fails to comply with any of its other material (in the Lender's reasonable opinion) obligations in respect of the Insurances for its Vessel.

21.1.4   **Other obligations**

An Obligor does not comply with any provision of the Finance Documents (excluding the Master Agreement) other than those referred to in Clauses 21.1.1 to 21.1.3 provided that no Event of Default will occur under this Clause 21.1.4 if the failure to comply is capable of remedy and is remedied within 7 Business Days of the Lender giving notice to the Borrowers.

21.1.5   **Event of Default under Master Agreement**

An "Event of Default" (as therein defined) occurs under the Master Agreement.

21.1.6   **Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of an Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made and is not remedied within 5 Business Days of the Lender giving notice to the Borrowers of the failure to comply.

21.1.7   **Cross default**

(a)     Any Financial Indebtedness of a member of the Group is not paid when due

or within any originally applicable grace period; or

(b)    any Financial Indebtedness of a member of the Group is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described); or

(c)    any Financial Indebtedness of a member of the Group becomes capable of being declared due and payable prior to its specified maturity as a result of an event of default (however described); or

(d)    any commitment to a member of the Group for any Financial Indebtedness is cancelled or suspended by a creditor of that a member of the Group by reason of an event of default (however described).

### 21.1.8   Insolvency

(a)    An Obligor is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with its creditors generally with a view to rescheduling any of its indebtedness; or

(b)    a moratorium is declared in respect of any indebtedness of a Borrower or the Corporate Guarantor.

### 21.1.9   Insolvency proceedings

Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of a Borrower or the Corporate Guarantor; or

(b)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of an Obligor or any of its assets; or

(c)    enforcement of any Security Interest over any assets of an Obligor,

or any analogous procedure or step is taken in any jurisdiction. This Clause 21.1.9 shall not apply to any winding-up petition with is frivolous or vexatious and is discharged, stayed or dismissed within 60 days of commencement.

### 21.1.10   Creditors' process

Any expropriation, attachment, sequestration, distress or execution affects the whole or what the Lender considers a material asset of an Obligor.

### 21.1.11 Security imperilled

Anything is done, suffered or omitted to be done or occurs which, in the reasonable opinion of the Lender, would in any way imperil the security created by the Finance Documents.

### 21.1.12 Death or mental incapacity of Personal Guarantor

The Personal Guarantor dies or becomes of unsound mind and the Borrowers do not, within 30 days of being required to do so by the Lender, provide the Lender with a replacement guarantee and indemnity and/or other additional security for the payment of the Outstanding Indebtedness from such person and in such form and substance as is acceptable to the Lender.

### 21.1.13 Change of ownership

Except with the prior consent of the Lender, a Borrower is not or ceases to be a wholly-owned subsidiary of the Corporate Guarantor.

### 21.1.14 Change or cessation of business

Save by reason of the Total Loss or sale in accordance with Clause 17.9 of a Vessel, any Obligor ceases, or threatens to cease, to carry on its business, or disposes or threatens to dispose of what the Lender considers a material part of its properties, assets or undertakings, or such a part is seized or nationalised, appropriated or compulsorily purchased by or under the authority of any government.

### 21.1.15 Unlawfulness, impossibility or repudiation

It becomes impossible or unlawful for an Obligor to fulfil any of its obligations under the Finance Documents, or for the Lender to exercise any of the rights vested in it by, or to enforce the security constituted by, the Finance Documents, or any of the Finance Documents for any reason becomes invalid or unenforceable or ceases to be in full force and effect or an Obligor repudiates or evidences an intention to repudiate any of the Finance Documents.

### 21.1.16 Revocation or modification of authorisations

Any licence, approval, consent, authorisation or registration at any time necessary or desirable for the validity, enforceability or admissibility in evidence of the Finance Documents, or for an Obligor to comply with its obligations under them, or in connection with the ownership or operation of the Vessel, is revoked, withheld or expires, or is modified in what the Lender considers a material respect.

### 21.1.17 Breach of Environmental Law

Any Borrower or other Obligor and/or any Environmental Affiliate fails to comply with any Environmental Law or any Environmental Approval or any Vessel or other Relevant Ship is involved in any incident which gives rise or may give rise to an

Environmental Claim if, in any such case, that non-compliance or incident or the consequences of it would, in the opinion of the Lender, have a material adverse effect on the business, assets, operations, property or financial condition of a Borrower or any other Obligor or on the security constituted by any of the Finance Documents.

### 21.1.18 Material Adverse Change

There is, in the opinion of the Lender, any Material Adverse Change from that pertaining at the date of the Loan Agreement and provided that in the event the Borrowers object, within 3 Business Days of being notified thereof by the Lender, to the existence of a Material Adverse Change in relation to (a) the financial condition of any Obligor or (b) the ability of any Obligor to perform and comply with its material payment obligations under any Finance Document or any Transaction Document, the Borrowers shall promptly appoint an independent third party reputable audit firm (the "**Third Party Firm**") reasonably acceptable to the Lender, to provide an opinion on the existence of such a Material Adverse Change, which shall be binding on the Borrowers and the Lender. Such opinion shall be provided within 20 Business Days of the Lender's acceptance of the Third Party Firm failing which such Material Adverse Change shall be deemed to have been accepted by the Borrowers and shall be deemed to have occurred for the purpose of this Agreement.

## 21.2 Lender's remedies

Upon the occurrence of an Event of Default which is continuing and at any time after it without prejudice to any of the rights and remedies of the Lender and/or the Swap Provider under any of the other Finance Documents or otherwise the Lender may, without the consent of the Swap Provider, take any one or more of the following actions:

21.2.1 by written notice to the Borrowers declare its commitment to advance the Loan cancelled, whereupon such commitment shall be cancelled;

21.2.2 by written notice to the Borrowers demand the immediate repayment of the Loan, all interest accrued thereon and all other Outstanding Indebtedness, whereupon such amount shall become immediately due and payable; and

21.2.3 take steps to exercise the rights and remedies conferred upon the Lender by this Agreement and the other Finance Documents and exercisable on or after the occurrence of an Event of Default, including but not limited to enforcing the security created by the Finance Documents.

## 22. ASSIGNMENTS AND TRANSFERS

## 22.1 No assignment or transfer by the Borrowers

No Borrower may assign or transfer all or any of its rights, benefits or obligations under this Agreement or under any of the other Finance Documents.

**22.2    Assignment, transfer and sub-participation by Lender**

The Lender may assign any of its rights under this Agreement or transfer by novation any of its rights and obligations under this Agreement to any other bank or financial institution, and may grant sub-participations in all or any part of the Loan to any person.

**22.3    No assignment or transfer by the Swap Provider**

The Swap Provider may not assign or transfer all or any of its rights, benefits or obligations under this Agreement or under any of the other Finance Documents without the prior written consent of the Borrowers and the Lender (such consent not to be unreasonably withheld or delayed).

**22.4    Disclosure of information**

The Lender may disclose to any potential assignee, transferee or sub-participant, or to any other party with whom it may propose to enter into contractual relations in connection with this Agreement or any other of the Finance Documents, such information about the Borrowers and the other Obligors and their respective businesses, assets or financial condition as the Lender shall consider appropriate.

**22.5    Change of lending office**

The Lender may at any time change the Lending Office through which it performs its obligations under this Agreement and the other Finance Documents provided that such change shall not result in an increase of any costs for the Borrowers.

For the purpose of this Clause 22.5 the expression **"Lending Office"** means the office notified by the Lender to the Borrowers in writing or before it becomes the Lender (or, following that date, by not less than 5 Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

**22.6    Delegation**

The Lender may at any time and from time to time delegate any one or more of its rights, powers and/or obligations under this Agreement and the other Finance Documents to any person (provided that the Lender shall remain fully responsible for the exercise or performance of any rights, powers and/or obligations delegated by it).

**22.7    Borrowers to assist**

The Borrowers undertake to do or to procure all such acts and things and to sign, execute and deliver or procure the signing, execution and delivery of all such instruments and documents as the Lender may reasonably require for the purpose of perfecting any such assignment, transfer, sub-participation or change of lending office as mentioned above.

23.    **PAYMENT MECHANICS**

23.1   **Place, time and manner of payment**

Unless otherwise specified by the Lender, all moneys to be paid by the Borrowers to the Lender under this Agreement and the other Finance Documents shall be paid to the Lender in Dollars by not later than 10:00 a.m. London time on the due date and in same day funds to such account as the Lender may from time to time notify the Borrowers. Each Borrower waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.

23.2   **Order of application**

Except as otherwise specifically provided in this Agreement or in any other of the Finance Documents, all moneys received or recovered by the Lender under the Finance Documents will, after discharging the cost (if any) incurred in collecting those moneys, be applied as follows:

23.2.1   first, in or towards payment of any unpaid fees, costs and expenses of the Lender under this Agreement;

23.2.2   secondly, in or towards the satisfaction of any amounts forming the balance of the Outstanding Indebtedness which are then due and payable, whether by reason of payment demanded or otherwise, pro rata between the Lender and the Swap Provider in such order of application as the Lender may, with the Swap Provider's approval, think fit;

23.2.3   thirdly, at the Lender's discretion, in retention on a suspense account of such amount as the Lender may consider appropriate to secure the discharge of any part of the Outstanding Indebtedness not then due and payable, and, upon any part of the Outstanding Indebtedness becoming due and payable, in or towards the discharge of it in accordance with the previous provisions of this Clause 23.2;

23.2.4   lastly, the surplus (if any) shall be paid to the Borrowers or whomsoever else shall be entitled to it.

The provisions of this Clause 23.2 will override any appropriation made by the Borrowers.

23.3   **Non-Business Days**

Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

23.4   **Accrual of interest and periodic payments**

All payments of interest and other payments of an annual or periodic nature to be made by the Borrowers shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a 360 day year.

23.5    **Control account**

The Lender will open and maintain on its books a control account showing the amounts owing to it from the Borrowers and the amounts of all payments of principal, interest and other moneys falling due and received by it. The Borrowers' obligation to repay the Loan, to pay interest thereon and to pay all other sums due under this Agreement shall be conclusively evidenced (in the absence of manifest error) by the entries from time to time made in the control account opened and maintained under this Clause 23.5.

24.    **SET-OFF**

The Lender may set off any matured obligation due from either Borrower under this Agreement or any other Finance Document (to the extent beneficially owned by the Lender) against any matured obligation owed by the Lender to that Borrower, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

25.    **MISCELLANEOUS**

25.1    **Time of essence**

Time is of the essence as regards every obligation of the Borrowers under this Agreement and the other Finance Documents.

25.2    **Remedies and waivers**

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under the Finance Documents shall operate as a waiver of it, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise of it or the exercise of any other right or remedy.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

25.3    **Waivers and amendments to be in writing**

Any waiver by the Lender of any provision of this Agreement or any other Finance Document, and any consent or approval given by the Lender under or in respect of this Agreement or any other Finance Document, shall only be effective if given in writing and then only strictly for the purpose and upon the terms for which it is given. Neither this Agreement nor any of the other Finance Documents may be amended or varied orally but only by an instrument signed by the Lender and each of the other parties to it.

25.4    **Severability**

If at any time one or more of the provisions of this Agreement or any other Finance Document is or becomes invalid, illegal or unenforceable in any respect under any law by which it may be governed or affected, the validity, legality and enforceability of the remaining provisions shall not be in any way affected or impaired as a result.

25.5   **Counterparts**

This Agreement may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute but one and the same instrument.

25.6   **Conclusiveness of certificates**

The certificate or determination of the Lender of a rate or amount under this Agreement and any other Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates and is binding on the Borrowers.

25.7   **Force majeure**

The Lender will not be liable for any failure on its part to provide or maintain the Loan or any part of it resulting, directly or indirectly, from any action, inaction or purported action of any government or governmental agency or any strike, boycott or blockade or any cause whatsoever outside its control.

25.8   **Further assurance**

The Borrowers shall, upon demand, and at their own expense, sign, perfect, do, execute and register all such further assurances, documents, acts and things as the Lender may require for the purpose of more effectually accomplishing or perfecting the transaction or security contemplated by this Agreement and the other Finance Documents.

25.9   **Parallel debt**

25.9.1   Notwithstanding any other provision of this Agreement, the Borrowers irrevocably and unconditionally undertake by way of an abstract acknowledgement of debt to pay to the Lender in its capacity as security agent for itself and the Swap Provider pursuant to the Agency Agreement (the **"Security Agent"**), as creditor in its own right and not as representative of the Swap Provider, sums equal to and in the currency of each amount payable (the **"Parallel Debt"**) by the Borrowers to each of the Lender and/or the Swap Provider under or by virtue of this Agreement, the Master Agreement and the other Finance Documents as and when that amount falls due for payment thereunder or would have fallen due but for any suspension of payment, moratorium, discharge by operation of law or analogous event.

25.9.2   The Security Agent shall have its own independent right to demand payment of the Parallel Debt payable by the Borrowers under this Clause 25.9, irrespective of any suspension, extinction or any other discharge for any reason whatsoever (otherwise than by payment) of the Borrower's obligation to pay those amounts to the Lender and/or the Swap Provider other than a discharge by virtue of payment which the Lender and/or the Swap Provider are entitled to retain.

25.9.3   Any amount due and payable by the Borrowers to the Security Agent under this Clause 25.9 shall be decreased to the extent that the Lender and/or the Swap Provider (as the case may be) have received (and are able to retain) payment in full of the corresponding amount under the other provisions of this Agreement, the Master

Agreement and the other Finance Documents and any amount due and payable by the Borrowers to the Lender and/or the Swap Provider under those provisions shall be decreased to the extent that the Security Agent has received (and is able to retain) irrevocable payment in full of the corresponding amount under this Clause 25.9.

25.9.4   The rights of the Swap Provider to receive payment of amounts payable by the Borrowers under this Agreement, the Master Agreement and the other Finance Documents are several and are separate and independent from, and without prejudice to, the rights of the Lender to receive payment under this Clause 25.9.

25.9.5   Any amounts received by the Security Agent shall, to the extent permitted by the mandatory provisions of any applicable law, be applied in accordance with Clause 23.

26.   **NOTICES**

26.1   **Communications in writing; addresses**

All communications (which expression includes any notice, demand, request, consent or other communication) to be given by one party to the other under this Agreement shall be in writing and (unless delivered personally) shall be given by telefax or first class pre-paid post (airmail if sent internationally) and be addressed:

26.1.1   in the case of the Lender, to it at:

9, quai du Président Paul Doumer
92920 Paris La Défense Cedex

For credit matters:

| | |
|---|---|
| Telefax No: | +33 1 41 89 2987 |
| Attn: | Stéphane Pattonieri |

For administrative matters:

| | |
|---|---|
| Telefax No: | +33 1 41 89 1934 |
| Attn: | Sylvie Godet-Couery |

26.1.2   in the case of the Borrowers, to them at:

c/o Semih Sohtorik Management & Agency
Cumhuriyet Caddesi, 21/1
Taksim, Istanbul 34437
Turkey

| | |
|---|---|
| Telefax No: | +90 212 237 2400 / 2401 |
| Attn: | Mr. Emir Sohtorik (for financial and credit matters) |
| Attn: | Mr Mehmet Basoglu (for administrative matters) |

or to such other address and/or number as is notified by one party to the other under this Agreement.

26.2 **Deemed receipt of communications**

Communications addressed as provided above shall be deemed to have been duly given when despatched (in the case of telefax), when delivered (in the case of personal delivery), 2 days after posting (in the case of letters sent within the same country), or 5 days after posting (in the case of letters sent internationally), provided that any communication to the Lender shall be effective only upon its actual receipt by the Lender and then only if it is expressly marked for the attention of the relevant department or officer named above (or any substitute from time to time notified by the Lender). In each of the above cases any communication received on a non-working day or after 5.00 p.m. in the place of receipt shall be deemed to be given at the opening of business hours on the next working day in that country.

26.3 **English language**

All communications and documents to be given or delivered pursuant to or otherwise in relation to this Agreement and the other Finance Documents shall be in the English language or be accompanied by a certified English translation.

27. **APPLICABLE LAW AND JURISDICTION**

27.1 **Governing law**

This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with English law.

27.2 **Submission to jurisdiction**

The Borrowers irrevocably agree for the exclusive benefit of the Lender that the English courts shall have jurisdiction in relation to any dispute and any suit, action or proceeding (referred to together in this Clause 27 as **"Proceedings"**) which may arise out of or in connection with this Agreement and/or any of the other Finance Documents, and for such purposes irrevocably submit to the jurisdiction of those courts.

27.3 **Service of process**

Each Borrower irrevocably agrees:

27.3.1 that, for the purpose of Proceedings in England, any legal process may be served upon SH Process Agents Limited whose registered office is presently at 1 Finsbury Circus, London EC2M 7SH and who, by this Agreement, are authorised to accept service on its behalf, which shall be deemed to be good service on that Borrower; and

27.3.2 that throughout the Facility Period it will maintain a duly appointed process agent in England, duly notified to the Lender, and that failure by any such process agent to give notice to that Borrower of such service shall not impair the validity of that service or of a judgment or order based on it.

27.4    **Choice of forum**

Nothing in this Clause 27 shall affect the right of the Lender to serve process in any manner permitted by law or limit the right of the Lender to take Proceedings against the Borrowers in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings by the Lender in any other jurisdiction, whether concurrently or not.

The Borrowers shall not commence any Proceedings in any country other than England in relation to any matter arising out of or in connection with this Agreement and/or any of the other Finance Documents.

27.5    **Forum convenience**

Each Borrower irrevocably waives any objection which it may at any time have on the grounds of inconvenient forum or otherwise to Proceedings being brought in any such court as is referred to in this Clause 27, and further irrevocably agrees that a judgment or order in any Proceedings brought in the English courts shall be conclusive and binding upon it and may be enforced without review in the courts of any other jurisdiction.

27.6    **Consent**

Each Borrower consents generally in respect of any Proceedings arising out of or in connection with this Agreement to the giving of any relief or the issue of any process in connection with those Proceedings, including without limitation, the making, enforcement or execution against any property or assets whatsoever of any order or judgment which may be made or given in those Proceedings.

27.7    **Waiver of immunity**

To the extent that a Borrower may be entitled in any jurisdiction to claim for itself or its property or assets immunity in respect of its obligations under this Agreement from service of process, jurisdiction, suit, judgment, execution, attachment (whether before judgment, in aid of execution or otherwise) or legal process, or to the extent that in any jurisdiction there may be attributed to it or its property or assets such immunity (whether or not claimed), that Borrower irrevocably agrees not to claim and irrevocably waives that immunity to the fullest extent permitted by the laws of that jurisdiction.

**IN WITNESS** of which the parties to this Agreement have executed this Agreement the day and year first before written.

## SCHEDULE 1

## FORM OF NOTICE OF DRAWDOWN

To:     Crédit Agricole Corporate and Investment Bank
        9, quai du Président Paul Doumer
        92920 Paris La Défense Cedex

Date: [• ] 2014

Dear Sirs

**Notice of Drawdown – $27,700,000 Loan Agreement dated [• ] 2014**

We refer to the loan agreement dated [• ] 2014 (the "**Loan Agreement**") made between ourselves as joint and several Borrowers and yourselves as Lender providing for the making available to us of a secured term loan in the amount of up to $27,700,000.

Expressions defined in the Loan Agreement shall have the same meanings when used in this letter.

Pursuant to Clause 5.1 of the Loan Agreement we give you notice that we wish to draw Tranche [A][B] in the sum of $13,850,000 under the Loan Agreement on [• ] 2014 and select a first Interest Period in respect of that Tranche of [3/6] month(s).

We request and authorise you to pay the proceeds of Tranche [A][B] to [*BNP Paribas loan account details to be inserted*] under reference [• ].

We confirm that:

1.      the representations and warranties made by us as set out in Clause 15 of the Loan Agreement are true and accurate on the date of this letter as if made on the same date as this letter; and

2.      no Event of Default or Potential Event of Default has occurred and is continuing or will occur as a result of the proposed borrowing.

Yours faithfully


.....................................
For and on behalf of
**DAWN SHIPPING LTD.**
**SUNSET SHIPPING LTD.**

## SCHEDULE 2

## CONDITIONS PRECEDENT

**Part 1**
**Initial conditions precedent**

1.    **Corporate documents of the Obligors**

1.1    Certified copies of the certificate of incorporation and articles of incorporation and bylaws (and all amendments thereto) or equivalent constitutional documents of each Obligor.

1.2    An original certificate of good standing for each Obligor dated as of a date reasonably near the date of the Notice of Drawdown and issued by the appropriate authority in its jurisdiction of incorporation, or other evidence that each Obligor is in good standing in its country of incorporation.

1.3    An original certificate in respect of each Obligor, signed by the secretary or a director of that Obligor, stating:

(a)    its officers and directors;

(b)    its shareholders;

(c)    that no licences, authorisations, approvals or consents are required by that Obligor in connection with the execution, delivery, performance, validity and enforceability of the Finance Documents and Transaction Documents to which it is (or is to become) a party or, if any such licences, authorisations, approvals or consents are required by it, attaching certified copies of them.

1.4    Certified copies of resolutions duly passed by the directors and, to the extent required in connection with any legal opinion mentioned below, the shareholders of each Obligor evidencing approval of the transactions contemplated by this Agreement, the other Finance Documents and the Transaction Documents and authorising the execution of them.

1.5    The original of any power of attorney issued by each Obligor in favour of any person or persons executing this Agreement, the other Finance Documents and/or the Transaction Documents.

2.    **Execution and registration of Finance Documents**

2.1    Originals of the following documents:

(a)    this Agreement executed by the Borrowers;

(b)    the Master Agreement executed by the Borrowers;

(c)    the Master Agreement Security executed by the Borrowers;

(d)    the Accounts Security executed by the Borrowers;

(e)     the Corporate Guarantee executed by the Corporate Guarantor;

(f)     the Personal Guarantee executed by the Personal Guarantor;

(g)     the Shares Charge in respect of each Borrower executed by the Corporate Guarantor together with all documents to be delivered thereunder;

(h)     all notices, acknowledgements, instruments and other documents as are required to be delivered to the Lender on or before the first Drawdown Date under the terms of the above Finance Documents, each duly executed (where appropriate) by the relevant parties.

3.      **Accounts**

Evidence that the Drydocking Accounts, the Earnings Accounts, and the Retention Accounts have each been duly opened.

4.      **Fees**

The Borrowers have paid to the Lender the fees and expenses set out in Clause 9 to the extent due and payable.

5.      **Process agent**

Confirmation from the agents in England nominated by the Obligors in the Finance Documents for the acceptance of service of process, that they consent to such nomination.

6.      **Legal opinions**

Legal opinions in form and substance satisfactory to the Lender (or confirmation satisfactory to the Lender that such legal opinions will be issued in form and substance satisfactory to it) from:

(a)     Holman Fenwick Willan France LLP concerning matters of French law;

(b)     Seward & Kissel LLP concerning matters of Marshall Islands law;

(c)     GUR Law Firm concerning such matters of Turkish law; and

(d)     such other lawyers appointed by the Lender concerning the laws of such other relevant jurisdictions as the Lender may reasonably require.

7.      **Know your customer**

Such certificates and documents as the Lender may require in order to comply with any anti-money laundering or "know your customer" legislation, regulation or procedures applicable to it.

**Part 2**
**Further conditions precedent to drawdown of a particular Tranche**

1.     **Updating documents**

In respect of the documents delivered by the Borrowers to the Lender pursuant to Part 1 of this Schedule 2, such updating documents as the Lender may require.

2.     **Execution and registration of Finance Documents**

2.1    Originals of the following documents in respect of the Vessel to which the Tranche relates (the **"relevant Vessel"**):

(a)     the Mortgage executed by the relevant Borrower;

(b)     the General Assignment executed by the relevant Borrower;

(c)     all notices, acknowledgements, instruments and other documents as are required to be delivered to the Lender on or before the relevant Drawdown Date under the terms of the above Finance Documents, each duly executed (where appropriate) by the relevant parties.

2.2    Evidence that the relevant Mortgage has been registered or is capable of immediate registration with first priority against the relevant Vessel at the appropriate ship registry of its Flag State.

3.     **Minimum balance on Earnings Account**

Evidence that the minimum amount referred to in Clause 14.4 has been credited to the Earnings Account for the relevant Vessel.

4.     **Title to the Vessel**

Evidence that the relevant Vessel's ownership title is registered in the sole name of the relevant Borrower under the laws and flag of an Approved Flag State free from all Security Interests except for Permitted Security Interests.

5.     **Classification**

A certificate of class maintained in respect of the relevant Vessel issued no more than 72 hours before the time of drawdown of the relevant Tranche confirming that she is classed with the highest class applicable to vessels of her age, type and specifications with the Classification Society free of overdue recommendations and conditions.

6.     **Insurances**

6.1    Evidence that the relevant Vessel is, or will from the relevant Drawdown Date be, insured in the manner required by the Finance Documents, that letters of undertaking will be issued in the manner required by the Finance Documents and that all other requirements of the Finance

Documents in respect of the Insurances of the relevant Vessel and the noting of the Lender's interest thereon have been complied with.

6.2    A favourable opinion on the Insurances of the relevant Vessel from the Lender's insurance advisers.

## 7.    Management

7.1    The following documents relating to the management of the relevant Vessel:

    (a)    a certified copy of the Management Agreement in all respects in form and substance acceptable to the Lender;

    (b)    an original of the Manager's Undertaking;

    (c)    such evidence as the Lender may reasonably require as to the due execution of the Manager's Undertaking by the Manager;

    (d)    a certified copy of the annual budget prepared by the Manager setting out that Vessel's projected Operating Expenses for the 12 month period commencing on the Drawdown Date.

## 8.    ISM Code and ISPC Code

8.1    The following documents relating to the safety and security of the relevant Vessel:

    (a)    a copy of the Document of Compliance in relation to the company responsible for the relevant Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code;

    (b)    a copy of the relevant Vessel's Safety Management Certificate as required by the ISM Code;

    (c)    a copy of the relevant Vessel's International Ship Safety Certificate as required by the ISPS Code.

## 9.    Charter

9.1    The following documents relating to the chartering of the relevant Vessel:

    (a)    a certified copy of any Charter together with the original of any Charter Guarantee relating thereto in all respects in form and substance acceptable to the Lender; and

    (b)    evidence that the relevant Vessel has been delivered to, and accepted by, the Charterer under such Charter.

## 10.    Valuation

A valuation of the relevant Vessel dated not earlier than 15 days prior to the relevant Drawdown Date determined in accordance with Clause 20 demonstrating that following drawdown of the relevant Tranche there will be no security shortfall under Clause 20.2.

11.   **Legal opinions**

Legal opinions in form and substance satisfactory to the Lender (or confirmation satisfactory to the Lender that such legal opinions will be issued in form and substance satisfactory to it) from:

(a)   Seward & Kissel LLP concerning such matters of Marshall islands law; and

(b)   such other lawyers appointed by the Lender concerning the laws of such other relevant jurisdictions as the Lender may reasonably require.

## SCHEDULE 3

## MANDATORY COSTS FORMULA

1.  The Mandatory Cost is an addition to the interest rate to compensate the Lender for the cost of compliance with (a) the requirements of the Bank of England, the Financial Conduct Authority (the "FCA") and/or the Prudential Regulation Authority (the "PRA") (or, in any case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

2.  On the first day of each Interest Period (or as soon as possible after it) the Lender shall calculate, as a percentage rate per annum, a rate (the "**Additional Cost Rate**"), in accordance with the paragraphs set out below. Such Additional Cost Rate shall be the Mandatory Cost.

3.  The Additional Cost Rate for the Lender if lending from a lending office in a Participating Member State will be the percentage certified by the Lender to be its reasonable determination of the cost (expressed as a percentage of the Loan) of complying with the minimum reserve requirements of the European Central Bank in respect of loans made from that lending office.

4.  The Additional Cost Rate for the Lender if lending from a lending office in the United Kingdom will be calculated by the Lender as follows:

    $$\frac{E \times 0.01}{300} \text{ per cent. per annum.}$$

    Where:

    E       is designed to compensate the Lender for amounts payable under the Fees Rules and is calculated by the Lender as being the most recent rate of charge determined by the Lender pursuant to paragraph 6 below and expressed in pounds per £1,000,000.

5.  For the purposes of this Schedule:

    5.1   "**Eligible Liabilities**" and "**Special Deposits**" have the meanings given to them from time to time under or pursuant to the Bank of England Act 1998 or (as may be appropriate) by the Bank of England;

    5.2   "**Fees Rules**" means the rules on periodic fees contained in the Financial Conduct Authority Handbook and the Prudential Regulation Authority Handbook or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits;

    5.3   "**Fee Tariffs**" means the fee tariffs specified in the Fees Rules under the activity group A.1 Deposit acceptors (ignoring any minimum fee or zero rated fee required pursuant to the Fees Rules but taking into account any applicable discount rate);

5.4   **"Participating Member State"** means any member state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to European Monetary Union; and

5.5   **"Tariff Base"** has the meaning given to it in, and will be calculated in accordance with, the Fees Rules.

6.   The Lender shall, as soon as practicable after publication by the FCA or the PRA, determine the rate of charge payable by it to the FCA or the PRA pursuant to the Fees Rules in respect of the relevant financial year of the FCA or the PRA (calculated for this purpose as being the average of the Fee Tariffs applicable to the Lender for that financial year) and expressed in pounds per £1,000,000 of the Tariff Base of the Lender.

7.   Any determination by the Lender pursuant to this Schedule in relation to a formula, the Mandatory Cost, the Additional Cost Rate or any amount payable to the Lender shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

8.   The Lender may from time to time, after consultation with the Borrowers, determine and notify to the Borrowers any amendments which are required to be made to this Schedule in order to comply with any change in law, regulation or any requirements from time to time imposed by the Bank of England, the FCA, the PRA or the European Central Bank (or, in any case, any other authority which replaces all or any of its functions) and any such determination shall, in the absence of manifest error, be conclusive and binding on all parties.

## EXECUTION PAGE

**THE BORROWERS**

| | |
|---|---|
| **SIGNED** | ) |
| by  EZIO  DAL MASO | ) |
| duly authorised Attorney in fact | ) |
| for and on behalf of | ) |
| **DAWN SHIPPING LTD.** | ) |

| | |
|---|---|
| **SIGNED** | ) |
| by  EZIO  DAL MASO | ) |
| duly authorised Attorney in fact | ) |
| for and on behalf of | ) |
| **SUNSET SHIPPING LTD.** | ) |

**THE SWAP PROVIDER**

| | |
|---|---|
| **SIGNED** | ) |
| by   R. A. RICE | ) |
| duly authorised for and on behalf of | ) |
| **CRÉDIT AGRICOLE CORPORATE AND** | ) |
| **INVESTMENT BANK** | ) |

( Attorney-in-Fact )

**THE LENDER**

| | |
|---|---|
| **SIGNED** | ) |
| by   **Anne-Laure ORANGE** | ) |
| duly authorised for and on behalf of | ) |
| **CRÉDIT AGRICOLE CORPORATE AND** | ) |
| **INVESTMENT BANK** | ) |