UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BANK OF AMERICA, N.A.                           CIVIL ACTION

VERSUS                                          NO: 21-559

M/V MARINE PRINCESS, her                        SECTION: "A" (3)
engines, tackle, appurtenances, etc.,
*in rem*, AND SUNSET SHIPPING
LTD., *in personam*

## ORDER AND REASONS

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 72)** ("First Motion for Summary Judgment") and **Motion for Summary Judgment to Enforce Preferred Ship Mortgage (Rec. Doc. 73)** ("Second Motion for Summary Judgment") filed by Plaintiff Bank of America, N.A. ("BOA"). Intervenor-Plaintiff AMS Ameropa & Sales AG ("AMS") opposes the First Motion for Summary Judgment. (Rec. Doc. 74). The Second Motion for Summary Judgment is unopposed. The motions, submitted for consideration on March 16, 2022, are before the Court on the briefs without oral argument. For the following reasons, the First Motion for Summary Judgment (Rec. Doc. 72) is GRANTED IN PART AND DENIED IN PART and the Second Motion for Summary Judgment (Rec. Doc. 73) is GRANTED.

## I.   BACKGROUND & PROCEDURAL HISTORY

This is a mortgage foreclosure action which arises out of a dispute over a loan, and the subsequent arrest and sale of the vessel secured by that loan. At all material times the M/V MARINE PRINCESS was owned by Sunset Shipping Ltd. ("Sunset Shipping" or "Defendant" or "Borrower" or "Owner").

On April 15, 2014, Sunset Shipping entered into a loan agreement with Plaintiff BOA's predecessor-in-interest, Crédit Agricole Corporate and Investment Bank ("Crédit Agricole"), under which a secured loan facility in the amount of $27,700,000 was made available to Sunset Shipping Ltd. and Dawn Shipping Ltd. as borrowers to be divided into two tranches of $13,850,000 each, for the purpose of permitting borrowers to refinance their indebtedness with respect to the M/V MARINE PRINCESS and her sister vessel the M/V MARINE PRINCE. (Rec. Doc. 21 at ¶ 7). The borrowers' liability under the loan agreement for the indebtedness is joint and several.

On May 12, 2014, a First Preferred Marshall Islands Mortgage was entered into between Crédit Agricole and Sunset Shipping as security for the indebtedness that Sunset Shipping assumed under the loan agreement. (Rec. Doc. 21-2). The mortgage was recorded that same day. (*Id.* at p. 28).

On March 4, 2021, Crédit Agricole assigned all rights and obligations arising from the loan agreement together with the first preferred mortgage to Plaintiff BOA. (Rec. Docs. 21-2 & 21-3). That day, the assignments were duly registered with the Office of the Maritime Administrator of the Republic of the Marshall Islands. (Rec. Doc. 21-5).

Sunset Shipping admittedly breached the loan agreement secured by the preferred ship mortgage by not making timely payments of principal as required by Clause 6.1 of the loan. (Rec. Doc. 75 at p. 1; Rec. Doc. 21 at p. 4). BOA and/or Crédit Agricole sent notices of default and reservation of rights to Sunset Shipping. (Rec. Doc. 21-6). Sunset Shipping failed to remedy its material breaches of the loan, which constituted continuing events of default under the loan. On April 27, 2021, pursuant to Clause 21.2 of the loan, BOA accelerated the loan. (Rec. Doc. 21-7).

All accrued interest and all other amounts accrued or owing under the financial documents and all other outstanding indebtedness were immediately due and payable as of April 27, 2021. Thus, as of April 27, 2021, Sunset Shipping is in default in the amount of at least $27,355,187.43, inclusive of accrued and default interest due and owing under the loan, and net of contractually agreed offsets.[1]  BOA claims that it is entitled to exercise the rights afforded to it under the loan agreement and the first preferred mortgage to recover that amount.

BOA filed this action against the MARINE PRINCESS, her engines, tackle, apparel, etc. *in rem*, and Sunset Shipping *in personam*, stating an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. (Rec. Doc. 1, Verified Complaint & Rec. Doc. 21, First Supplemental and Amended Verified Complaint). Specifically, BOA sought to enforce its preferred ship mortgage lien *in rem* against the vessel, to arrest the property of Sunset Shipping pursuant to the mortgage, and for judgment against Sunset Shipping *in personam* under the mortgage. (*Id.*).

The MARINE PRINCESS was arrested on March 19, 2021, pursuant to process issued by this Court. (Rec. Doc. 7, Order). On September 21, 2021, AMS filed an intervening complaint, asserting a claim against Sunset Shipping, *in personam*, for its alleged breach of the parties' charter party agreement, and a claim *in rem* against the MARINE PRINCESS, seeking judgment against the vessel and the arrest thereof under Supplemental Rule C of the Federal Rules of Civil Procedure. (Rec. Doc. 28). According to AMS's complaint, AMS is the time charterer of the MARINE PRINCESS pursuant to a

---

[1] Liability under the loan agreement for the indebtedness is joint and several. Therefore, Sunset Shipping is liable for the entire amount owed under the loan agreement. (Rec. Doc. 21-1).

time charter party dated March 15, 2018, entered into with Sunset Shipping. (Rec. Doc. 28). AMS provided the following excerpts from the charter party:

| | |
|---|---|
| Line 16 | Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter . . . |
| Clause 3 | Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel . . . |
| Clause 18 | Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be repaid at once . . . |
| Clause 54 | Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any expenses directly related to the vessel shall be for Owners' account. . . . |

(*Id.* at p. 3). AMS stated that the charter party agreement is governed by English law and provides for arbitration in London. (*Id.* at p. 6). AMS further stated that, at the time of filing, AMS had initiated arbitration proceedings in London against Sunset Shipping. (*Id.*).

AMS claims that, as a result of Sunset Shipping's actions and inactions, including its failure to make payments, AMS has not been provided with the intended use of the vessel as contemplated by the charter party. Specifically, AMS alleges it suffered financial loss of profit in the amount of $2,910,357.90 under the sub-charter party that AMS entered into on March 11, 2021, prior to the vessel's arrest on March 19, 2021. (*Id.* at p. 3). According to AMS, AMS was unable to deliver the vessel to the sub-charterers because of Sunset Shipping's actions and inactions, and the sub-charterers canceled the sub-charter party. (*Id.)* AMS also claims to have incurred the following losses: the value of the bunkers on board at time of completion of discharge ($274,764.80), overpaid hire and

CVE paid to Sunset Shipping ($84,421.16), pilotage fees incurred in connection with the vessel's arrest ($5,307.12), and any further sums that may be claimed later. (*Id.* at pp. 4–5). AMS argues that the failure of Sunset Shipping to fulfill its obligations set out in the charter party constitutes a breach of a maritime contract, giving rise to a maritime lien on the vessel that AMS is entitled to foreclose upon.

Ultimately, security for the MARINE PRINCESS's release was not posted and on January 5, 2022, the Court ordered the interlocutory sale of the vessel to take place on February 3, 2022. (Rec. Docs. 54 & 56).

On January 28, 2022, prior to the judicial sale of the vessel, AMS filed an Emergency Motion for Order to Amend Warrant and Order of Interlocutory Sale (Rec. Doc. 57) asking the Court to amend its Orders to exclude the bunkers of fuel oil aboard the vessel. The Court denied AMS's motion, reasoning that the complaint in intervention asserts claims against all of the vessel's equipment and that AMS's ownership interest in the bunkers, if any, is sufficiently protected by its intervenor claims. (Rec. Doc. 66). To the extent that AMS has any ownership interest in the fuel bunkers, the Court stated that AMS's share of the proceeds of the sale can be calculated at a later date. (*Id.*). The Court also found that the warrant of arrest correctly included the bunkers because BOA filed a verified complaint to enforce a maritime lien and persuasive authority indicates that the lien includes the entire vessel, as well as the equipment that is an integral part of the vessel's navigation and operation, even if owned by someone other than the vessel owner. (*Id.*).

On February 3, 2022, the vessel was sold at an auction conducted by the U.S. Marshal's Service, as is where is, with no warranties, free and clear of all liens,

encumbrances, and pre-existing claims on the vessel, whether recorded or otherwise, to Clearwater Transport Ltd. C/O Lila Global Liberia for $16.4 million. (Rec. Doc. 67). The Court confirmed the sale on February 17, 2022. (Rec. Doc. 71). The proceeds from the sale of the MARINE PRINCESS, exclusive of the Marshal's fees and commission, are now deposited in the registry of the Court. Notably, the proceeds will not satisfy both BOA's and AMS's interests.

On February 21, 2022, BOA filed its First Motion for Summary Judgment on the issue of whether AMS has valid maritime liens about the MARINE PRINCESS. (Rec. Doc. 72). According to BOA, AMS does not hold a valid maritime lien for breach of a charter party because the charter party in question calls for the application of English law, and English law does not recognize such a lien. BOA adds that AMS cannot claim a lien for the bunkers on the vessel because AMS did not physically supply the bunkers and because, as charterer of the vessel with full knowledge of the "no lien clause" in the charter party[2] and control of the vessel's destiny, AMS cannot create a lien in its own favor. Lastly, BOA argues that, even if AMS holds the alleged liens, the liens are outranked by BOA's foreign preferred ship mortgage.

AMS opposes the motion arguing that AMS has maritime liens against the vessel and that, by virtue of these liens, AMS should be afforded process to assert its claims. (Rec. Doc. 74). AMS further argues that BOA should not be able to avail itself of the terms of AMS and Sunset Shipping's contract because that would amount to an unjust

---

[2] BOA admits that it has not seen the actual charter party between AMS and Sunset Shipping because neither party to the contract has provided it. However, BOA notes that AMS relies on the charter party for its "full terms and effects," and BOA has never seen a charter party without a "no lien" clause. (Rec. Doc. 72-3 at p. 6).

enrichment. AMS states that the following facts are contested: (1) whether BOA has an interest in the bunkers that is superior to the interests of AMS as charterer and owner of the bunkers and (2) whether the proceeds from the sale of those bunkers should be divested from the judicial proceeds of the sale and distributed back to AMS as owners of the bunkers before ranking the competing maritime liens. (Rec. Doc. 74-1).

On March 1, 2022, BOA filed its Second Motion for Summary Judgment (Rec. Doc. 75) on the issue of whether BOA has a valid preferred ship mortgage. BOA seeks a judgment recognizing and enforcing its preferred ship mortgage on the MARINE PRINCESS. No parties oppose the motion. In fact, Sunset Shipping filed a response conceding that BOA has a valid preferred ship mortgage upon the vessel, that Sunset Shipping failed to make timely payments under the loan agreement secured by that mortgage, and that BOA is entitled to enforce its preferred mortgage lien against the vessel in the amount of $27,355,187.43, inclusive of accrued and default interest as of April 27, 2021. (Rec. Doc. 75).

The Court considers BOA's motions below.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). "[A] dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 994 F.3d

704, 707–08 (5th Cir. 2021) (quoting *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Sedgwick James*, 276 F.3d at 759 (citing *Anderson*, 477 U.S. at 255).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Sedgwick James*, 276 F.3d at 759 (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position. Id. (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

## III.  **DISCUSSION**

Under the Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31301 *et seq.*, (hereinafter referred to as "CIMLA" or "The Act"), on judicial sale in the enforcement of a ship mortgage, the foreign preferred ship mortgage lien takes priority over all other claims against a vessel except for expenses and fees allowed by the court, costs imposed by the court (collectively referred to as "*custodia legis*"), preferred maritime liens, and maritime liens for necessaries provided in the United States. 46 U.S.C.§ 31326(b); *Bank*

*One v. MR. DEAN MV*, 293 F.3d 830, 832 (5th Cir. 2002). Accordingly, when a foreign

preferred ship mortgage is involved, the following ranking of liens is applicable:

> (1) *custodia legis*;
>
> (2) preferred maritime liens;
>
> (3) preferred ship mortgages (U.S. flag vessels);
>
> (4) other maritime contract liens that accrue after the filing of a preferred ship mortgage (U.S. flag vessel) and prior to a foreign preferred ship mortgage (however, liens for all necessaries provided in the United States have priority over foreign preferred ship mortgages irrespective of the time they arose);
>
> (5) foreign preferred ship mortgages; and
>
> (6) maritime contract liens (excluding those for necessaries provided in the United States, which have priority over a foreign preferred ship mortgage).

Robert Force, 2d *Admiralty and Maritime Law* (2013) at pp. 182–83. Section

31301(5) defines a "preferred maritime lien" as a maritime lien on a vessel:

> (A) arising before a preferred mortgage was filed under section 31321 of this title;
>
> (B) for damage arising out of maritime tort;
>
> (C) for wages of a stevedore when employed directly by a person listed in section 31341 of this title;
>
> (D) for wages of the crew of the vessel;
>
> (E) for general average; or
>
> (F) for salvage, including contract salvage;

46 U.S.C. § 31301(5).

In order to determine whether BOA or AMS is entitled to the funds in the registry

of the Court and, if both are entitled, the appropriate ranking order, this Court must first

establish the following: (1) whether BOA has a valid and enforceable foreign preferred ship mortgage lien, and (2) whether AMS has valid and enforceable maritime liens. The first issue is raised in BOA's Second Motion for Summary Judgment and the second issue is raised in BOA's First Motion for Summary Judgment. The Court will address each motion in that order.

### A. Second MSJ: Validity of BOA's Mortgage

Under the CIMLA, a preferred ship mortgage includes a mortgage that is established as a security on a foreign vessel if the mortgage was (1) executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and (2) has been registered under those laws in the public register at the port of registry of the vessel or at a central office. 46 U.S.C. § 31301(6)(B). "[A] preferred mortgage is a lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel" and it provides the mortgagee with a cause of action to enforce the lien in federal court upon the default of any term of the preferred mortgage. 46 U.S.C. § 31325(b)(1). Specifically, the CIMLA states that in the event of default, the mortgagee may:

> (1) enforce the preferred mortgage lien in a civil action in rem for a . . . foreign vessel;
>
> (2) enforce a claim for the outstanding indebtedness secured by the mortgaged vessel in—
>
>> (A) a civil action in personam in admiralty against the mortgagor, maker, comaker, or guarantor for the amount of the outstanding indebtedness or any deficiency in full payment of that indebtedness; and
>>
>> (B) a civil action against the mortgagor, maker, comaker, or guarantor for the amount of the outstanding indebtedness or

any deficiency in full payment of that indebtedness . . .

46 U.S.C. § 31325(b)(1)–(2).

A review of the record reveals that BOA has provided sufficient evidence showing that it has a valid foreign preferred ship mortgage and that Sunset Shipping defaulted on its payment obligations. Exhibit 8, a declaration by John Nathan Held, evidences that the MARINE PRINCESS was at all material times registered in the Republic of the Marshall Islands and that the mortgage was properly recorded in the Maritime Office of the Republic of the Marshall Islands, which is the public registry for documenting ownership of vessels and ship mortgages for vessels registered in the Marshall Islands. (Rec. Doc. 73-13, Exhibit 8). Moreover, the assignment of the mortgage and corresponding loan agreement to BOA from its predecessor was properly executed and recorded. (Rec. Docs. 1-4, 1-5).

The record also reflects that Sunset Shipping breached the loan agreement and the mortgage by failing to make repayments as required by Clause 6.1 of the loan agreement and that BOA, pursuant to the loan agreement, accelerated the loan. (Rec. Docs. 73-4 at p. 4-6, 73-5). Consequently, Sunset Shipping defaulted in the amount of $27,355,187.43, inclusive of accrued and default interest, and BOA can enforce its preferred mortgage to recover that indebtedness. Thus, because BOA meets the statutory definition of a preferred ship mortgage, BOA has a valid and enforceable preferred ship mortgage lien on the MARINE PRINCESS in the amount of $27,355,187.43.

Notably, Sunset Shipping and AMS do not dispute the validity of BOA's foreign preferred ship mortgage or dispute that Sunset Shipping defaulted on its payment obligations under the loan agreement secured by BOA's mortgage.

Considering the foregoing, the Court finds that no genuine dispute of material fact exists as to Sunset Shipping's default and the validity of BOA's mortgage. Accordingly, BOA is entitled to foreclose on its mortgage due to Sunset Shipping's default, and the Court grants BOA's Second Motion for Summary Judgment (Rec. Doc. 73).

Thus, the remaining issue before the Court is whether AMS has valid maritime liens against the MARINE PRINCESS, and, if so, whether BOA's mortgage outranks those liens.

### B. First MSJ: Validity of AMS's Liens & Ranking

In BOA's First Motion for Summary Judgment, BOA requests this Court to dismiss AMS's claims in intervention, arguing that AMS does not have valid maritime liens and, even if AMS has valid liens, BOA's foreign preferred ship mortgage primes or outranks them. (Rec. Doc. 72). BOA explains that the charter party underlying AMS's claims is subject to English law which does not recognize an *in rem* remedy or lien for breach of a charter party. (Rec. Doc. 72-3 at p.1). Even if AMS does have a lien for breach of a charter party, BOA claims its preferred ship mortgage outranks this lien because it arose after BOA's mortgage. (*Id.* at p. 7). BOA also argues that AMS does not have a lien for the value of the bunkers which AMS allegedly arranged to load aboard the vessel because AMS did not physically supply the bunkers and because AMS was the charterer in control of the vessel at the time it purchased the bunkers. (*Id.* at p. 2). Even if AMS does have a lien for necessaries, BOA claims its foreign preferred ship mortgage outranks this claim given that the necessaries were not supplied in the United States. (*Id.*).

AMS argues in opposition that, as the time charterer of the vessel, AMS possesses a maritime lien on the vessel *in rem* and a claim against Sunset Shipping *in personam*

due to Sunset Shipping's breach of the charter party. (Rec. Doc. 74 at p. 1). AMS states that prior to the vessel's arrest on March 19, 2021, it purchased 737.261 MT of VLSFO fuel and 80.267 MT of LSMGO fuel ("bunkers") on March 2, 2021, and, thus, at the time of the judicial sale of the vessel, AMS owned what remained of these bunkers. (*Id.* at p. 2). By virtue of its maritime lien against the vessel, AMS claims it should be afforded the process to assert its claim. (*Id.*). AMS argues (in what seems like a vague attempt to address BOA's argument that English law governs) that BOA is not a party to the contract between AMS and Sunset Shipping and, thus, should not be permitted to enforce or avail itself of the benefits of its terms. Instead, "the proper course of action is for the Court sitting in admiralty to remedy BOA's unjust enrichment." (*Id.* at p. 3).

Whether AMS has valid maritime liens for breach of the charter party and for necessaries turns on whether United States law or English law applies. Although U.S. law provides for liens for breach of a charter party and liens for necessaries, English law does not. Under English law, a maritime lien exists only for salvage, collision damages, seaman's wages, bottomry, master's wages, and master's disbursements. *The Halcyon Isle* [1981] A.C. 221, per Lord Diplock at pp. 232–33; *see also* C. Hill, K. Soehring, T. Hosoi, & C. Helmer, *Arrest of Ships* 2-3 (1985); *see also* S. Harley, *How to Secure a Maritime Lien* 40-43 (1981). Notably the list does not include liens for breach of a charter party or for necessaries.

According to the complaint in intervention, the charter party between AMS and Sunset Shipping is governed by English law.[3] BOA cites to this statement as proof that

---

[3] "The Charter Party is governed by English law and provides for arbitration in London." (Rec. Doc. 28 at ¶8, Verified Complaint in Intervention).

English law should govern the creation of maritime liens in this case. AMS does not explicitly dispute the argument that English law governs but argues that the terms of the contract should not exclude AMS's claim. Neither party attaches the actual charter party or cites to any outside evidence (other than the verified complaint in intervention) to support or oppose the argument that English law applies.

Cases within the Fifth Circuit suggest that the language within the parties' contract can control which law determines the existence of maritime liens. *See Liverpool and London S.S. Protection and Indem. Ass'n Ltd. v. QUEEN OF LEMAN MV*, 296 F.3d 350 (5th Cir. 2002) (examining the contract between the parties to determine whether English law determines the existence of a maritime lien for necessaries and holding that English law applies); *see also Marine Oil Trading Ltd. v. M/V SEA CHARM,* CIV.A. 02-2281, 2003 WL 292309 (E.D. La. Feb. 10, 2003) ("Courts in this district routinely apply the English legal standard for the existence of maritime liens where contracts expressly designate that English substantive law governs."); *Bolongon v. M/V NOR ATLANTIC,* CIV. A. 99-1261, 1999 WL 804070 (E.D. La. Oct. 5, 1999) ("where a service contract is governed by English law, the existence of a maritime lien is to be determined by English law, not the law of the forum.") (*citing J.P. Provos Mar. S.A. v. M/V AGNI,* CIV. A. 99-106, 1999 WL 558151 (E.D. La. July 28, 1999); *see also Sembawang Shipyard, Ltd. v. Charger, Inc.,* 955 F.2d 983 (5th Cir.1992). However, in all of these cases, the courts were provided with the actual contract or exact excerpts of the relevant language and the holdings differed depending on the specific phrasing of the choice-of-law language within the contracts.

Here, the Court does not have the benefit of reviewing the relevant language in the charter party agreement, as it is not in the record. Without seeing the actual language of

the contract between the parties in this case, the Court is deprived of determining with any degree of certainty whether English law governs the creation of maritime liens. Regardless of whether U.S. or English law governs, however, the Court finds that any maritime liens held by AMS are outranked by BOA's mortgage.

### Lien for Breach of the Charter Party

As mentioned above, English law does not provide for a maritime lien with respect to claims for breach of a charter party. Under U.S. law, breach of a charter party gives rise to a maritime lien. *International Marine Towing v. Southern Leasing Partners, Ltd.*, 722 F.2d 126, 130–33 (5th Cir. 1983); *Bank One, Louisiana N.A. v. MR. DEAN MV*, 293 F.3d 830, 832 (2002). Even if we assume that U.S. law applies, and that AMS has a valid maritime lien for breach of a charter party, BOA's preferred mortgage outranks the lien.

Under U.S. law, a maritime lien for breach of a charter party will be a preferred maritime lien if it attaches before a ship mortgage is filed, i.e. recorded. *Bank One*, 293 F.3d at 832 (*citing* 46 U.S.C.§ 31301(5)(A)). The lien attaches when the vessel owner places the vessel at the charterer's disposal even though the breach might have occurred much later in time. *Id.* at 835; *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1027 n. 6 (2d Cir.1973); *see International Marine Towing, Inc. v. Southern Leasing Partners*, 722 F.2d 126, 131 n. 8 (5th Cir.1983) ("Delivery of the vessel commences the performance of a time charter and removes it from executory status.").

Here BOA's mortgage was filed, or recorded, on May 12, 2014. The charter party agreement was executed on March 15, 2018. AMS does not indicate the date on which the vessel was placed at AMS's disposal. However, given that the agreement was executed on March 15, 2018, the earliest date that delivery could have occurred was that

same day. Because BOA's mortgage was recorded four years before March 15, 2018, BOA's mortgage clearly outranks AMS's lien.

### Lien for Necessaries

AMS also claims that it is entitled to the price paid for the bunkers that it purchased and provided to the vessel at its last bunkering port in Gibraltar on March 2, 2021. (Rec. Doc. 74 at p. 2; Rec. Doc. 28 at ¶14(b)). Specifically, AMS asserts that because it bought the bunkers, AMS owns the bunkers and is entitled to the value of the bunkers on board at the time of completion of discharge, in the amount of $274,764.80. (Rec. Doc. 28 at ¶14(b)).

Again, the distinction between U.S. and English law is significant here. Clause 3 of the charter party agreement states that "the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel . . . ." (Rec. Doc. 28 at ¶ 9). As previously stated, AMS's complaint in intervention states that the agreement is governed by English law, but the Court does not have the benefit of reviewing the contractual language to make that determination. Regardless, the Court finds that, under both U.S. and English law, AMS does not have a lien for necessaries and that, even if it did, BOA's mortgage outranks the lien.

Under English law, a company supplying a vessel with bunkers does not have a maritime lien; it would have only a less powerful statutory right in rem, which is only a right to arrest the debtor's ship (or other property). *See The John G. Stevens*, 170 U.S. 113, 117 (1898) ("Claims for necessaries [in England] do not possess, *ab origine*, a lien, but carry only a statutory remedy against the res, which is essentially different." (*quoting* The Gustaf, (1862) Lush 506, 508)); *Liverpool and London S.S. Protection and Indem.*

*Ass'n Ltd. v. QUEEN OF LEMAN MV*, 296 F.3d 350, 352–53 (5th Cir. 2002) (holding that under English law, the plaintiff would have no maritime lien for necessaries, but under U.S. law, the plaintiff would have a lien for necessaries); *see also Cockett Marine Oil Ltd. v. M/V LION*, CIV. A. 11-464, 2011 WL 1833286 at *3 (E.D. La. May 12, 2011) ("[W]hether Cockett is entitled to a maritime lien against the M/V LION . . . turns on which law controls: if U.S. law applies, then Cockett likely could maintain a lien for necessaries; if English law applies, however, then no such maritime lien exists for necessaries and its rule C claim fails."); *see also Marine Oil Trading Ltd. v. M/V SEA CHARM*, CIV. A. 02-2281, 2003 WL 292309 at *3 (E.D. La. Feb. 10, 2003)("It is well settled that English law does not recognize maritime liens for the provision of necessaries").

Under U.S. law, any person providing necessaries[4] to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel. 46 U.S.C. § 31342(a)(1). The Act also provides that, in addition to the vessel owner, a "charterer" of a vessel is presumed to have authority to procure necessaries for the vessel. 46 U.S.C. § 31341(a). The "lien arises automatically upon the furnishing of necessaries." *Riffe Petroleum Co. v. Cibro Sales Corp.,* 601 F.2d 1385, 1389 (10th Cir.1979); *see Equilease Corp. v. M/V SAMPSON,* 793 F.2d 598, 602 (5th Cir.1986) ("The lien arises when the debt arises . . . .").

The purpose of providing a maritime lien for the provision of necessaries is to encourage vendors to promptly furnish vessels with supplies and repairs so as to facilitate the continued operation of vessels in commerce. *Racal Survey USA, Inc. v. M/V MOUNT*

---

[4] "Necessaries" includes repairs, supplies, towage, and the use of a dry dock or marine railway. 46 U.S.C. § 31301(4).

*FLEET*, 231 F.3d 183, 187 (5th Cir. 2000); *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 223-24 (5th Cir. 1999). Reliance upon the credit of the vessel itself, as opposed to the credit of the owner or some other party, is a fundamental concept underlying the maritime lien. *Lake Charles Stevedores*, 199 F.3d at 224 n.3 (*citing Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 605 (5th Cir. 1986)). Under current law the person providing necessaries to a vessel is presumed to have relied on the credit of the vessel. *Racal Survey*, 231 F.3d at 188–89; *see* 46 U.S.C. § 31342(a)(3). The presumption is rebuttable, however, and credit to a vessel remains a prerequisite to a lien so credit to the owner negates the possibility of a lien. *Racal Survey*, 231 F.3d at 189 (*quoting Equilease*, 793 F.2d at 605).

The Court is persuaded that under the particular circumstances of this case, AMS is not entitled to a maritime lien against the MARINE PRINCESS for the provision of necessaries. Maritime liens are *stricti juris*, *Racal Survey*, 231 F.3d at 192 (*citing Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1 (1920)), because they threaten the bargained-for security that other creditors have relied upon. The law recognizes that ease of obtaining necessaries is so important to the vessel that vendors who supply and service the vessel must be protected when the owner defaults on payment. But in keeping with the narrow nature of the maritime lien, a supplier must deal with a person who has authority to bind the vessel, *see* 46 U.S.C. § 31341, and he must act in good faith, *see Lake Charles Stevedores*, 199 F.3d at 225 (noting that a supplier who has actual knowledge of a no-lien clause will not be entitled to a maritime lien), in order to obtain a lien.

In this case AMS was not acting as a supplier of necessaries to this vessel. Clause

3 of the time charter party in this case states that "the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel . . . ." (Rec. Doc. 28 at ¶ 9). Under the clear terms of Clause 3 of the agreement, AMS had control of the vessel when it incurred the fuel expenses at the port of delivery and AMS incurred those expenses in accordance with its contractual obligation. In other words, AMS was clearly the entity with authority under 46 U.S.C. § 31341 to bind the vessel but AMS was dealing with itself in the capacity as both charterer and supplier of the services. This occurred because AMS was not acting as a third-party supplier of services to the vessel but as a party who had contracted with Sunset Shipping to charter the vessel at a profit to both parties under the terms of the Agreement. Allowing AMS to claim a maritime lien on the vessel would be contrary to the purpose of allowing bona fide suppliers the protection of a maritime lien. *See Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1207 (5th Cir. 1978) (recognizing that parties such as owners, part owners, and joint venturers—parties who are not strangers to the vessel—cannot hold a maritime lien against the vessel for equitable reasons).

Moreover, a lien cannot exist where the supplier does not rely on the credit of the vessel itself. Although an ordinary arms-length supplier would be entitled to the presumption that it relied on the credit of the vessel, it is not so clear that such a presumption applies under these facts. Moreover, the express terms of the agreement itself belie any such presumption because the agreement leaves little doubt that AMS was relying on the credit of the owner (Sunset Shipping) when it agreed to pay for the fuel at the port of delivery.

In sum, AMS does not have a valid maritime lien for necessaries under U.S. law

or English law. However, even if AMS was entitled to a maritime lien for the bunkers, it purchased pursuant to either law, the lien would be outranked by BOA's mortgage. As stated previously, under the CIMLA, a foreign preferred ship mortgage outranks maritime liens for (1) necessaries provided before the mortgage was filed or (2) provided in the United States, regardless of when the necessaries were provided. Here, the mortgage was recorded on May 12, 2014, and the bunkers were provided on March 2, 2021, in Gibraltar. Because AMS did not provide the bunkers before the preferred mortgage arose, and because AMS's did not furnish supplies to the vessel in the United States, any potential lien for necessaries held by AMS is inferior to BOA's mortgage. *See Sasportes v. M/V Sol De Copacabana,* 581 F.2d 1204, 1209 (5th Cir. 1978)(holding that of those monies advanced to the vessel for necessaries, only those advances made in the United States have priority over the foreign preferred ship mortgage); *see also Morgan Guaranty Trust Co. v. M/V Grigorios C. IV.*, 615 F.Supp. 1444 (1985)(holding that even if intervenor was entitled to a lien for necessaries for oil supplied to the vessel, the oil was not supplied in the United States and, therefore, the lien is inferior to Plaintiffs' mortgage).

## IV.   <u>CONCLUSION</u>

In sum, BOA holds a valid preferred ship mortgage, Sunset Shipping defaulted on that mortgage, and as a result BOA is entitled to a judgment against the MARINE PRINCESS in the amount of Sunset Shipping's indebtedness. Further, BOA is entitled to the funds in the registry of the Court from the sale of the MARINE PRINCESS because, despite whether AMS has valid maritime liens or not, BOA's preferred ship mortgage lien outranks any of AMS's potential maritime liens.

What is unclear and cannot be resolved with the scant evidence before the Court,

is whether AMS has valid maritime liens against the MARINE PRINCESS. If English law applies to the creation of maritime liens in favor of Intervenor AMS, AMS does not have a lien for breach of the charter party agreement or a lien for necessaries. If U.S. law applies instead, AMS has a maritime lien for breach of the charter party and possibly has a lien for necessaries, but BOA's mortgage outranks the liens. Regardless, BOA has first-priority ranking and shall receive the proceeds of the sale of the MARINE PRINCESS located in the Court's registry. However, the Court is not releasing the funds at this time because the litigation is ongoing.

Accordingly;

**IT IS ORDERED** that Plaintiff Bank of America's **Motion for Summary Judgment to Enforce Preferred Ship Mortgage (Rec. Doc. 73),** wherein Plaintiff declares that it has a valid foreign preferred ship mortgage on the M/V MARINE PRINCESS, under which mortgage Sunset Shipping has defaulted, is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment be entered against the M/V MARINE PRINCESS, in rem, and in favor of Plaintiff Bank of America in the full amount owed by Sunset Shipping under the loan agreement and mortgage. As stated above, the outstanding indebtedness owed by Sunset Shipping is $27,355,187.43, inclusive of accrued and default interest due and owing under the loan agreement as of April 27, 2021, plus applicable default interest, costs and expenses of enforcement, and net of contractually agreed offsets.

**IT FURTHER ORDERED** that Bank of America's **Motion for Summary Judgment (Rec. Doc. 72)** is **GRANTED IN PART AND DENIED IN PART.** The motion is granted to the extent that Bank of America seeks a ruling that its mortgage outranks any potential

liens held by AMS Ameropa & Sales AG ("AMS"). The motion is denied to the extent that Bank of America asks this Court to dismiss AMS's claims in intervention. Whether AMS in fact holds maritime liens against the MARINE PRINCESS depends in large part upon whether English law or U.S. law applies. Therefore, AMS's claims remain pending before this Court.

  **IT IS FURTHER ORDERED** that Bank of America is entitled to the entirety of the funds in the registry of the Court from the sale of the MARINE PRINCESS, in the amount of $16.4 million. However, because this litigation is ongoing, the Court is not releasing the funds in the registry at this time.

  April 27, 2022

                 _____
                   JAY C. ZAINEY
               UNITED STATES DISTRICT JUDGE